# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
January 5, 2012 Session

## BETTY SAINT ROGERS v. LOUISVILLE LAND COMPANY ET AL.

**Rule 11 Appeal by Permission from the Court of Appeals, Eastern Section**
**Chancery Court for Bradley County**
**No. 04-117      Jerri S. Bryant, Chancellor**

---

**No. E2010-00991-SC-R11-CV - Filed April 19, 2012**

---

In this appeal, the defendants seek a review of the trial court's decision to award the plaintiff compensatory and punitive damages based on the tort of intentional infliction of emotional distress arising out of inadequate maintenance of the cemetery where the plaintiff's son was buried. To recover damages for intentional infliction of emotional distress, a plaintiff must prove that the defendant's conduct was either intentional or reckless, was so outrageous that it is not tolerated by civilized society, and caused a serious mental injury to the plaintiff. The primary question presented is whether the plaintiff in this action proved the requisite serious mental injury to support the trial court's award of compensatory and punitive damages. We hold that the plaintiff's proof was deficient. The judgment of the Court of Appeals is affirmed.

**Tenn. R. App. P. Rule 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed; Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

James F. Logan, Jr., Cleveland, Tennessee, for the appellant, Betty Saint Rogers.

David F. Hensley, Chattanooga, Tennessee, for the appellees, Louisville Land Company and Joe V. Williams, III.

**OPINION**

**I.**

In 2001, Betty Saint Rogers' son died in a motorcycle accident and was buried in a grave plot in the Fort Hill Cemetery ("the cemetery") in Cleveland, Tennessee.[1] Following her son's death, Ms. Rogers purchased easements from Louisville Land Company to two adjacent burial plots in the cemetery. When she purchased the easements, she had some concerns about the maintenance of the cemetery. She asked a representative of Louisville Land Company if the cemetery was regularly mowed and maintained, and was assured that it was. This, however, was not the case. According to Ms. Rogers, grass was higher than the headstones in places, some of the headstones were overturned, the roads were not in good condition, and there was debris in the cemetery. Ms. Rogers became very emotional and tearful when she visited her son's grave and saw the lack of cemetery maintenance.

In April of 2004, she brought this action against Louisville Land Company and Joe V. Williams, III, its sole shareholder and owner, as owners of a portion of the cemetery, alleging that the defendants "knowingly, intentionally and recklessly allowed the [cemetery] properties to be grown up with weeds covering markers, accumulate trash and otherwise become a scene of disarray and disrespect for those whose bodies have been laid to rest in the cemetery." Ms. Rogers asserted causes of action for "outrageous conduct, fraudulent conduct, intentional infliction of emotional distress, breach of contract, gross and reckless misconduct, and wrongful business practices generally," as well as violations of the Tennessee Consumer Protection Act and the statutes governing maintenance of cemeteries in Tennessee.[2]

Also in April 2004, the State of Tennessee, through the District Attorney General, filed a separate action against Louisville Land Company styled "Petition to Enforce Cemetery Maintenance" alleging, among other things, that the defendant had failed to consistently maintain Fort Hill Cemetery as required by Tennessee Code Annotated section

---

[1] The grave plot in which Ms. Rogers' son was buried had been previously purchased by her son's father. For simplicity and ease of reference, our reference to "the cemetery" or "Fort Hill Cemetery" in this opinion includes only that portion of Fort Hill Cemetery that is owned by the defendants. The portion of the cemetery not owned by the defendants is not at issue in this case.

[2] The complaint was filed as a proposed class action lawsuit, with Ms. Rogers suing on behalf of herself and all others similarly situated. The trial court later entered an order finding that the parties had announced to the court that the case would proceed to trial solely on Ms. Rogers' individual claims and not as a class action.

46-2-306 (2000).[3] The hearings on the State's lawsuit were conducted over several days in September of 2005 and March of 2006. Although the trial court did not consolidate Ms. Rogers' lawsuit with the State's lawsuit,[4] the parties agreed and the trial court ruled that any proof presented in the State's case would not have to be presented a second time during the hearing of Ms. Rogers' case.

At the hearings on the State's petition in 2005 and 2006, the State presented several witnesses who testified that the cemetery had been poorly and inconsistently maintained for many years; that grass and weeds had been allowed to grow as high or higher than the monument gravestones; that areas of the cemetery were overgrown with shrubs and mimosa trees; that the condition of many roads was very poor and some of them were impassable by car; that areas in the cemetery had been damaged by erosion; and that some of the gravestones had been broken or had sunk into the ground. Numerous photographs of the cemetery were entered into evidence. Mr. Williams testified that in 1982 he became the sole owner and shareholder of Louisville Land Company, which was the owner and operator of the cemetery. Mr. Williams admitted that he had been aware of maintenance problems at the cemetery over the years. He testified that the problems were generally due to recurring difficulties with the maintenance contractors, stating that there had been "mechanical difficulties, machine breakdown, weather, people not showing up to work, people not employing good subcontractors, and people not completing their contract."

The trial court entered an order on March 3, 2006, holding that Louisville Land Company "failed to maintain the [c]emetery as required by Tennessee Code Annotated § 46-2-306 so as to reflect respect for the memory of the dead in keeping with the reasonable sensibilities of survivors of those whose remains are interred" there. The trial court appointed three petitioners, including Ms. Rogers, to serve on the Fort Hill Cemetery Committee to recommend a plan of appropriate maintenance for the cemetery. On October 23, 2006, the trial court entered an order requiring Louisville Land Company to, among other

_____

[3] Tennessee Code Annotated section 46-2-306 (2000) was transferred to section 46-1-304 effective January 1, 2007. Act of May 25, 2006, ch. 1012, sec. 4, 2006 Tenn. Pub. Acts, 2702, 2732-33. At all pertinent times, the statute provided that "[a]s to matters within its reasonable control, a cemetery company shall maintain its cemeteries so as to reflect respect for the memory of the dead in keeping with the reasonable sensibilities of survivors of those whose remains are interred in [such] cemeteries." Tenn. Code Ann. § 46-1-304(a) (2007). The statute also authorizes a State action as was filed in this case, providing that "[t]he district attorney general in whose district a cemetery is situated may bring an action in chancery court to remedy any violation of this section" under certain enumerated conditions. Id. § 46-1-304(b)(1).

[4] Both actions were filed in the Chancery Court for Bradley County, and they were heard by the same chancellor. The record contains Louisville Land Company's motion to consolidate the two actions, and Ms. Rogers' response stating that she did not object to consolidation, but the trial court never entered an order consolidating the two actions. The State is not a party to this appeal.

things, complete a registry of the cemetery plots and grave spaces and create internal regulations to ensure correct mapping of the plots; clear and clean culverts; construct drainage ditches to control runoff; make necessary repairs to any paved road currently in existence in the cemetery; grade level all the gravel roads; employ and staff a ground maintenance crew of at least three people who will fully maintain the cemetery year-round; have the cemetery mowed at least bi-weekly during growing season; reset all the gravestones currently fallen or sunken; and prohibit the construction of any new walls in the cemetery.

On February 25, 2008, the trial court ruled that Louisville Land Company and Mr. Williams were in contempt of court based on the court's findings that headstones had not been replaced, the registry had not been completed, and all of the culverts and drainage ditches either had not been opened or had not remained open. The court also ordered Mr. Williams to adjust the maintenance crew schedule to comply with the court's previous order.

On July 14, 2008, the trial court entered its final order in the State's action, finding that the defendant had complied with the court's order entered in October of 2006, except for matters involving scheduled mowing, grading and graveling of the roads, and completing the plot registry. The trial court found that there had been substantial improvement in the grounds and the roads in Fort Hill Cemetery and ordered the defendants to continue to maintain the cemetery roads and grounds in accordance with prior court orders. Upon the agreement of the parties, the Cemetery Committee was dissolved.

In February 2010, the trial court conducted a non-jury trial of Ms. Rogers' separate claims, which are the subject of this appeal. Ms. Rogers testified that her son died in a motorcycle accident in 2001 and was buried in a plot in the cemetery that had been previously purchased by her son's father. Several months after her son was buried, Ms. Rogers bought easements to two additional lots in the cemetery so she could be buried next to her son. Ms. Rogers testified that when she decided to purchase the easements, she "had vaguely noticed some of the things there that I would like to have seen look better. Mowing was one of the things, and the roads were in bad condition. There was trash at the end of the road, flowers, that kind of thing lying around." She spoke with a representative of Louisville Land Company about her concerns regarding the care and maintenance of the cemetery grounds, asking "if the cemetery was maintained, if it was mowed on a regular basis, if it was cared for, cleaned, kept clean; and I was assured that it was."

Ms. Rogers testified that after she bought the easements on July 9, 2001, "[t]he conditions didn't improve. If anything, they deteriorated more." She described the condition of her son's grave site and the cemetery in general as follows:

> Some of the grass was higher than the headstones. There was [sic] headstones that had been overturned, lying there. The roads were in terrible condition. Some of the land was open. You could tell that erosion was really taking an effect on it. It wasn't cleaned. There was debris lying there. It, it just wasn't maintained. It wasn't, it wasn't mowed.

Ms. Rogers considered the condition and appearance of the cemetery to be "very degrading, it was disrespectful, to say the least." She stated that the cemetery's condition caused her to be "very emotional, very tearful."

At the close of Ms. Rogers' proof, the trial court granted the defendants' motion to dismiss all of Ms. Rogers' claims except her claims for "outrageous conduct" and breach of contract. Ms. Rogers' counsel then announced to the court that she was abandoning her claim for relief pursuant to the Tennessee statutes regulating cemeteries. At the end of the trial, the trial court awarded Ms. Rogers a judgment of $250 for breach of contract, $45,000 in compensatory damages for "outrageous conduct," $250,000 in punitive damages, $37,306.25 in attorney's fees, and $556.42 in discretionary costs. The trial court further held that its judgment would be against both Louisville Land Company and Mr. Williams personally. The defendants appealed. The Court of Appeals reversed the award of compensatory damages, holding that Ms. Rogers had failed to present sufficient proof establishing that she had suffered a "serious mental injury," which was a required element of her claim. Rogers v. Louisville Land Co., No. E2010-00991-COA-R3-CV, 2011 WL 2112766, at *4 (Tenn. Ct. App. May 25, 2011). The Court of Appeals also reversed the award of punitive damages, the award of attorney's fees, and the judgment against Mr. Williams personally. Id. at *5-7.

We granted Ms. Rogers' application for permission to appeal. We address the following issues: (1) whether there was sufficient proof of serious mental injury to support a judgment for compensatory and punitive damages based on the tort of intentional infliction of emotional distress; (2) whether Ms. Rogers was entitled to an award of attorney's fees; and (3) whether Mr. Williams should be held personally liable for the judgment rendered in Ms. Rogers' favor.

## II.

We are reviewing a trial court's order following a non-jury trial. Therefore, our review is de novo upon the record, accompanied by a presumption of correctness of the trial court's findings of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); Gautreaux v. Internal Med. Educ. Found., 336 S.W.3d 526, 532 (Tenn. 2011). The trial court's conclusions of law are subject to a de novo review with no

presumption of correctness.  Harman v. Univ. of Tenn., 353 S.W.3d 734, 736-37 (Tenn. 2011).

At the outset, we note that Ms. Rogers' complaint incorrectly alleged a claim for both "intentional infliction of emotional distress" and "outrageous conduct."  Intentional infliction of emotional distress and outrageous conduct are different names for the same cause of action—not two separate torts.  Bain v. Wells, 936 S.W.2d 618, 622 n.3 (Tenn. 1997) (citing Moorhead v. J.C. Penney Co., 555 S.W.2d 713, 717 (Tenn. 1977) (discussing the "cause of action for intentional or reckless infliction of severe emotional distress by means of extreme and outrageous conduct" and observing that this tort "has become known as 'outrageous conduct'")).[5]  The trial court's ruling on the defendants' motion to dismiss at the close of Ms. Rogers' proof illustrates the potential for the confusion that can result from having two names for the same tort.  The trial court granted the defendants' motion to dismiss as to the plaintiff's claim for intentional infliction of emotional distress, but allowed the case to proceed on the outrageous conduct claim—even though the claims are one and the same.  Although the term "outrageous conduct" has gained widespread use as a substitute or shorthand for intentional infliction of emotional distress, it is more accurately and correctly used as referring to an *element* of intentional infliction of emotional distress.  Because having two names for the same tort—"intentional infliction of emotional distress" and "outrageous conduct"—engenders potential confusion and misunderstanding and may lead to error, courts and litigants should no longer refer to "outrageous conduct" as a separate, independent cause of action, nor as a synonym for the tort of intentional infliction of emotional distress.

Ms. Rogers' claim is based on the tort of intentional infliction of emotional distress.  The elements of an intentional infliction of emotional distress claim are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff.  See Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004); Leach v. Taylor, 124 S.W.3d 87, 92 (Tenn. 2004); Bain, 936 S.W.2d at 622.  Regarding the first element, the law is clear in Tennessee and elsewhere that either intentional or reckless conduct on the part of the defendant will suffice to establish intentional infliction of emotional distress.  See, e.g., Lourcey, 146 S.W.3d at 51 ("To state a claim for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant's conduct was *intentional or reckless . . . .*")

---

[5] See also Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville, 154 S.W.3d 22, 31 (Tenn. 2005) (discussing "[t]he tort of intentional infliction of emotional distress, also known as the tort of outrageous conduct"); Lane v. Becker, 334 S.W.3d 756, 762 n.3 (Tenn. Ct. App. 2010) ("Intentional infliction of emotional distress and outrageous conduct are different names for the same tort."); Lyons v. Farmers Ins. Exch., 26 S.W.3d 888, 893 (Tenn. Ct. App. 2000) ("Intentional infliction of emotional [di]stress and outrageous conduct are simply different names for the same cause of action . . . .").

(emphasis added)); Leach, 124 S.W.3d at 91-92 (noting that the first element of prima facie showing of intentional infliction of emotional distress is "the conduct complained of must be *intentional or reckless*" (emphasis added) (quoting Bain, 936 S.W.2d at 622)). Miller v. Willbanks, 8 S.W.3d 607, 612 (Tenn. 1999); Medlin v. Allied Inv. Co., 398 S.W.2d 270, 274 (Tenn. 1966) (abrogated on other grounds by Camper v. Minor, 915 S.W.2d 437, 444 (Tenn. 1996)); see also Restatement (Second) of Torts § 46 (1965) ("One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . . ."); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 45 cmt. g (Tentative Draft No. 5, 2007) ("Courts uniformly hold that reckless conduct, not just intentional conduct, can support a claim for intentional infliction of emotional disturbance."); John J. Kircher, The Four Faces of Tort Law: Liability for Emotional Harm, 90 Marq. L. Rev. 789, 799 (2007) ("[A]lthough the rule is dubbed 'Intentional Infliction,' recovery also will be allowed when the defendant's conduct is not intended to cause emotional distress, but the defendant is merely reckless in doing so."). Ms. Rogers did not allege or prove that the defendants intended to cause harm or emotional distress to anyone by neglecting the maintenance of Fort Hill Cemetery. Instead, the alleged wrongful conduct was reckless, which need not be directed at a specific person or occur in the plaintiff's presence. Doe 1, 154 S.W.3d at 41.[6]

The issue presented in this case is whether Ms. Rogers proved the third required element of her claim, that the defendant's conduct caused her to suffer serious mental injury.[7] As discussed further below, the torts of intentional infliction of emotional distress

---

[6] Since Doe 1 was decided, there has been some confusion and inconsistency regarding whether "reckless infliction of emotional distress" is a separate and distinct tort from intentional infliction of emotional distress. The Court of Appeals, in Harris v. Horton, 341 S.W.3d 264 (Tenn. Ct. App. 2009), stated that "Tennessee recognizes a claim for reckless infliction of emotional distress, distinct from intentional or negligent infliction of emotional distress." Id. at 274. This Court, however, has observed numerous times that intentional infliction of emotional distress can be proven by a showing of either reckless or intentional behavior. Lourcey, 146 S.W.3d at 51; Leach, 124 S.W.3d at 91-92; Miller, 8 S.W.3d at 612; Bain, 936 S.W.2d at 622; Medlin, 398 S.W.2d at 274. This approach is consistent with the Restatement (Second) of Torts and the Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 45 (Tentative Draft No. 5, 2007). Although Doe 1 makes it clear that the analysis differs somewhat when the claimant alleges reckless conduct, see id. 154 S.W.3d at 38, it does not expressly hold that reckless infliction of emotional distress is a separate tort. To the extent that Harris v. Horton held otherwise, it is overruled.

[7] We do not address the issues of whether the first and second elements of intentional infliction of emotional distress were satisfied in this case, and our decision should not be construed as expressing an opinion regarding whether the defendants' conduct was reckless or so outrageous that it is not tolerated by civilized society.

and negligent infliction of emotional distress[8] share a common, identical element—the "serious or severe" mental injury requirement. The elements of a claim for negligent infliction of emotional distress include the elements of a general negligence claim, which are duty, breach of duty, injury or loss, causation in fact, and proximate causation. Lourcey, 146 S.W.3d at 52.[9] In addition, the plaintiff must prove that the defendant's conduct caused a serious or severe emotional injury. Id.[10] Thus, both actions for intentional infliction of emotional distress and negligent infliction of emotional distress (including all three "subspecies" of negligent infliction: "stand-alone," "parasitic," and "bystander") require an identical element: a showing that the plaintiff suffered a serious mental injury resulting from the defendant's conduct.

Although this case involves the tort of intentional infliction of emotional distress, our analysis would be the same if it were for negligent infliction of emotional distress because both torts require proof of serious or severe mental injury. See Eskin, 262 S.W.3d at 739 (in "bystander" negligent infliction of emotional distress case, plaintiff must prove "the resulting serious or severe emotional injury to the plaintiff"); Flax, 272 S.W.3d at 528 (in "stand-alone" negligent infliction of emotional distress case, plaintiff must prove "through expert medical or scientific proof that he or she has suffered a 'severe' emotional injury"); Doe 1, 154 S.W.3d at 39 (in intentional infliction case involving reckless conduct, "[t]he mental harm which the plaintiff suffered also must be demonstrated to have been particularly

---

[8] Ms. Rogers did not assert a claim for negligent infliction of emotional distress in this case.

[9] As we observed in Eskin, the elements of a "bystander" claim for negligent infliction of emotional distress are as follows:

> When a plaintiff did not witness the injury-producing event, the cause of action for negligent infliction of emotional distress requires proof of the following elements: (1) the actual or apparent death or serious physical injury of another caused by the defendant's negligence, (2) the existence of a close and intimate personal relationship between the plaintiff and the deceased or injured person, (3) the plaintiff's observation of the actual or apparent death or serious physical injury at the scene of the accident before the scene has been materially altered, and (4) the resulting serious or severe emotional injury to the plaintiff caused by the observation of the death or injury.

Eskin, 262 S.W.3d at 739.

[10] When the claim for negligent infliction of emotional distress is a "stand-alone" claim, i.e., one for emotional disturbance alone in the absence of a physical injury, the serious or severe mental injury must be proven "through expert medical or scientific proof." Flax, 272 S.W.3d at 528. When the cause of action for negligent infliction is for "emotional damages [that] are a 'parasitic' consequence of negligent conduct that results in multiple types of damages," there is no requirement that the serious or severe mental injury be proven by expert proof. Estate of Amos v. Vanderbilt Univ., 62 S.W.3d 133, 137 (Tenn. 2001).

serious"); Lourcey, 146 S.W.3d at 51 (in an intentional infliction of emotional distress case, plaintiff must prove that "the defendant's conduct resulted in serious mental injury to the plaintiff"); Miller, 8 S.W.3d at 614 ("[T]he injury sustained in both torts [intentional infliction of emotional distress and negligent infliction of emotional distress] is the same . . . "). Consequently, in analyzing the "serious mental injury" requirement, we look to case law in the context of both intentional and negligent infliction of emotional distress torts.

In recognizing the tort of intentional infliction of emotional distress in Medlin, the Court, quoting section 46 of the Restatement (Second) of Torts,[11] concluded that there must be proof that the conduct complained of was outrageous, not tolerated in civilized society, and resulted in serious mental injury. Medlin, 398 S.W.2d at 274. We observed the following in discussing the policy reasons for and against allowing legal redress for serious mental injury when "recovery is sought for mental or emotional disturbance alone," id. at 272:

> Memory and empathy tell us that the "hurt" perceived through sensory media other than that of touch may be just as painful if not more so than the "hurt" perceived by the tactile sense. Moreover, physicians tell us that the consequences of invasions of the person accomplished through the perceptory media of sight and sound may be *as* damaging, if not *more* damaging than invasions of the person accomplished through the sense of touch.
>
> . . . .
>
> Mental suffering . . . is no more difficult to prove and no harder to calculate in terms of money than the physical pain of a broken leg which has never been denied compensation and courts have been quite willing to allow large sums of money as damages for mental anguish itself where it accompanies a slight physical injury.
>
> . . . .
>
> Since medical science has long since recognized that not only fright and shock, but also grief, anxiety, rage and shame are in themselves "physical" injuries in

---

[11] Since Medlin, this Court has cited section 46 and the comments and illustrations thereto on numerous occasions. See Doe 1, 154 S.W.3d at 31-32, 37; Leach, 124 S.W.3d at 92; Miller, 8 S.W.3d at 612, 615 n.4, 616; Bain, 936 S.W.2d at 622-23; Moorhead, 555 S.W.2d at 717; Goldfarb v. Baker, 547 S.W.2d 567, 568-69 (Tenn. 1977); Swallows v. W. Elec. Co., 543 S.W.2d 581, 582-83 (Tenn. 1976).

the sense that they produce well marked changes in the body, and symptoms that are readily visible to the professional eye; the layman now understands to some extent that such consequences are normal, rather than the unusual result of many types of conduct.

Id. at 272-73 (emphasis in original). The Medlin Court concluded that "[t]he law has developed to the extent that the personal interest in peace of mind is protected from 'outrageous' interference *which results in substantial emotional damage*." Id. at 275 (emphasis added).

Later, in Camper v. Minor, 915 S.W.2d 437 (Tenn. 1996), this Court reviewed the development and evolution of the tort of negligent infliction of emotional distress in Tennessee, and adopted a "general negligence" approach in describing the proof a plaintiff must present to avoid summary judgment. We held that there should only be recovery for "serious or severe" emotional injury to avoid trivial or fraudulent actions. Id. at 446. The Camper Court defined a "serious or severe" emotional injury as one that occurs "'where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'" Id. (quoting Rodrigues v. State, 472 P.2d 509, 520 (Haw. 1970)).

Following Camper, in Ramsey v. Beavers, 931 S.W.2d 527 (Tenn. 1996), we made it clear that there should not be recovery for "'every minor disturbance to a person's mental tranquility,' but only for serious or severe emotional injuries." Id. at 532 (quoting Barnhill v. Davis, 300 N.W.2d 104, 107 (Iowa 1981)). We noted that there should be no recovery for fright or fear alone or "hurt feelings, trivial upsets, or temporary discomfort." Ramsey, 931 S.W.3d at 532. Rather, recovery should be only for "serious or severe emotional injuries which disable a reasonable, normally constituted person from coping adequately with the stress." Id. (footnote omitted).

In Miller, we ruled that in a case for intentional infliction of emotional distress, expert testimony is not required to establish the existence of a serious mental injury. 8 S.W.3d at 612, 616. Miller clarified that the analysis of the "serious mental injury" requirement is the same for both intentional infliction of emotional distress claims and negligent infliction of emotional distress claims. Id. at 614. In Miller, we observed that "[t]he flagrant and outrageous nature of the defendant's conduct . . . adds weight to a plaintiff's claim and affords more assurance that the claim is serious." Id. at 613 (citing Brower v. Ackerley, 943 P.2d 1141, 1149 (Wash. Ct. App. 1997); Tanner v. Rite Aid of W. Va., Inc., 461 S.E.2d 149, 161 (W. Va. 1995)). The "extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." Restatement (Second) of Torts]

§ 45 cmt. j. Finally, the <u>Miller</u> court provided illustrations of the kind and character of proof a plaintiff may provide to demonstrate "serious mental injury":

> Such proof may include a claimant's own testimony, as well as the testimony of other lay witnesses acquainted with the claimant. Physical manifestations of emotional distress may also serve as proof of serious mental injury. Moreover, evidence that a plaintiff has suffered from nightmares, insomnia, and depression or has sought psychiatric treatment may support a claim of a serious mental injury. The intensity and duration of the mental distress are also factors that may be considered in determining the severity of the injury.

8 S.W.3d at 615 (internal citations omitted). Based on our recognition that "there will be many cases in which a judge or jury may not appreciate the full extent and disabling effects of a plaintiff's emotional injury without expert evidence," we observed that "although not legally required, expert testimony may be the most effective method of demonstrating the existence of severe emotional distress." <u>Id.</u> (internal quotation marks omitted).

Most recently, in <u>Eskin</u>, we reiterated that "severe emotional injury" occurs when "a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." 262 S.W.3d at 735 n.21, (quoting <u>Camper</u>, 915 S.W.2d at 446); <u>see also</u> <u>Flax</u>, 272 S.W.3d at 528 (same).

Further illustration regarding what constitutes a "severe mental injury" is provided by Section 46 of the Restatement (Second) of Torts, often cited by our courts in a discussion of this area of the law:[12]

> The rule stated in this Section applies only where the emotional distress has in fact resulted, and where it is severe. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered

---

[12] <u>See, e.g.,</u> cases cited <u>supra</u> note 11.

in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.

Restatement (Second) of Torts § 46 cmt. j; <u>see also</u> <u>Miller</u>, 8 S.W.3d at 615 n.4 (quoting <u>id.</u>). The reason for the rule imposing liability only when extreme and outrageous conduct causes serious or severe emotional distress is apparent—to avoid the judicial system being flooded with potentially fraudulent, manufactured, or overstated claims arising from the "transient and trivial" emotional distresses of daily life, recognizing that "[i]f the plaintiff is to recover every time that [his or] her feelings are hurt, we should all be in court twice a week." Note, Russell Fraker, <u>Reformulating Outrage: A Critical Analysis of the Problematic Tort of IIED</u>, 61 Vand. L. Rev. 983, 988 (2008) (quoting William L. Prosser, <u>Intentional Infliction of Mental Suffering: A New Tort</u>, 37 Mich. L. Rev. 874, 877 (1939)). The Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 45 (Tentative Draft No. 5, 2007) further explains the reasoning for "why recovery for emotional harm is more restrictive than recovery for physical harm"[13] by observing that

> [t]oo much trivial or modest emotional disturbance occurs in modern life for the law to attempt to provide universal peace of mind. . . . [S]ome degree of emotional disturbance, even significant disturbance, is part of the price of living in a complex and interactive society. Requiring proof that the emotional disturbance is severe (and the result of extreme and outrageous conduct) provides some assurance that the harm is genuine.

<u>Id.</u> at § 45 cmt. i.

To summarize the preceding review of the law in Tennessee regarding the "severe mental injury" element of the torts of intentional infliction of emotional distress and negligent infliction of emotional distress, the following nonexclusive factors inform the analysis and are pertinent to support a plaintiff's claim that he or she has suffered a serious mental injury:

(1) Evidence of physiological manifestations of emotional distress, including but not limited to nausea, vomiting, headaches, severe weight loss or gain, and the like;

---

[13] Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 45 cmt. a (Tentative Draft No. 5, 2007).

(2) Evidence of psychological manifestations of emotional distress, including but not limited to sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry;

(3) Evidence that the plaintiff sought medical treatment, was diagnosed with a medical or psychiatric disorder such as post-traumatic stress disorder, clinical depression, traumatically induced neurosis or psychosis, or phobia, and/or was prescribed medication;

(4) Evidence regarding the duration and intensity of the claimant's physiological symptoms, psychological symptoms, and medical treatment;

(5) Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and

(6) In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury.

The plaintiff may present this evidence by his or her own testimony, the testimony of lay witnesses acquainted with the plaintiff such as family, friends, and colleagues, or by the testimony of medical experts.

The conclusion that a serious or severe mental injury occurs "where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case" should be interpreted with the foregoing discussion and nonexclusive list of factors in mind. At least one knowledgeable commentator has criticized the "unable to adequately cope" standard, opining that "[t]his is an unfortunate definition. Over the long run, most people can 'cope' with almost anything. They may need therapy, they may need medication, they may need both, but they can 'cope.'" John A. Day, A Primer on the Law of Negligent Infliction of Emotional Distress, Tenn. B.J., May 2005, at 28 n.5. We agree that the "unable to cope" language is somewhat hyperbolic. "Unable to cope with the mental stress engendered" means that the plaintiff has demonstrated, by means of the six enumerated factors above or other pertinent evidence, that he or she has suffered significant impairment in his or her daily life resulting from the defendant's extreme and outrageous conduct. Moreover, the definition found in comment j to the Restatement (Second) of Torts, stating that "[t]he law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it," is equally if not more hyperbolic than the "unable to cope" standard. Most people are also able to "endure" a great many things, and in common linguistic usage, a person can be said

to "endure" anything that does not kill or completely incapacitate him or her. We do not approve of the continued usage of the "unable to endure it" standard as an instruction or standard in determining what constitutes a serious or severe mental injury.

We now apply the foregoing principles to Ms. Rogers' claim for intentional infliction of emotional distress. To recover damages, she was required to prove that the defendant's conduct was: (1) intentional or reckless; (2) so outrageous that it is not tolerated by civilized society; and (3) caused her to suffer serious mental injury. Doe 1, 154 S.W.3d at 41. The trial court in this case made findings of fact pertaining to only elements (1) and (2), finding the conduct of Mr. Williams and Louisville Land Company to be "reckless towards the dead and to the living who go to visit the dead" and to be "outrageous" in several instances. The trial court made no finding of fact regarding whether Ms. Rogers had suffered mental injury. Therefore, we review the record de novo to determine where the preponderance of the evidence lies. Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997); see also Hickman v. Cont'l Baking Co., 143 S.W.3d 72, 75 (Tenn. 2004) ("When the trial court fails to make findings of fact, there is nothing upon which the presumption of correctness can attach."); Burlew v. Burlew, 40 S.W.3d 465, 470 (Tenn. 2001).

As the Court of Appeals correctly observed, the evidence regarding Ms. Rogers' alleged mental injuries was "at best, sparse." Rogers, 2011 WL 2112766, at *4. The following is the entire proof in the record regarding Ms. Rogers' injury or damages, consisting of her own testimony at trial:

Q: What impact did this have on you as you were going to your son's grave and taking care of the gravesite yourself? What – how did this affect you?

A: You were already grieving because you have lost someone that's very precious to you. And when you go to the cemetery, you – this should be a time where you are reflecting on memories of that loved one, not a time of going to weed eat the cemetery, looking as if they didn't exist, that they didn't – they're not cared for. You're leaving someone – when you bury them, you're leaving them in the care of the people that you buy their lot from, and this was very degrading, it was disrespectful, to say the least.

Q: . . . What impact, in addition to feeling this sense of disrespect and those things – did it physically affect you? Did you cry? Did you –

A: It was very, very emotional, very tearful. I knew that I had to do something to change this, and in 2004 I filed a suit with Mr. Logan; and since then I have seen some changes as a result of that; and I would like to see more.

-14-

Although we are not without sympathy for Ms. Rogers, who while mourning the loss of her son was faced with an overgrown and ill-maintained cemetery where his remains were interred, we agree with the intermediate court that the evidence preponderates against a finding of serious mental injury in this case. Ms. Rogers' testimony was insufficient to establish the requisite serious mental injury. Ms. Rogers provided no evidence, by her own testimony or of anyone else, that she suffered physiological or psychological symptoms, sought medical or professional treatment, or incurred any significant impairment in her daily functioning resulting from the defendants' conduct. We affirm the judgment of the Court of Appeals reversing the trial court's judgment in the amount of $45,000 in compensatory damages for "outrageous conduct."

### III.

Next we turn to the trial court's award of $250,000 in punitive damages to Ms. Rogers. The Court of Appeals held that Ms. Rogers failed to prove intentional infliction of emotional distress, and on that basis, reversed the trial court's judgment for punitive damages. Ms. Rogers argues that an award of punitive damages is appropriate in this case based solely on her breach of contract claim.[14]

Ms. Rogers concedes that at the trial court level, the parties did not discuss the issue of whether she should be awarded punitive damages for breach of contract. She states, however, that whether the trial court could have based an award of punitive damages on breach of contract alone was irrelevant at the time of trial because the trial court found in her favor on both the "outrageous conduct"[15] and the breach of contract claims, and the same misconduct was the basis for both claims. She argues that the trial court awarded punitive damages ostensibly to punish Louisville Land Company and Mr. Williams for bad behavior with respect to both the claim of outrageous conduct and the breach of contract. We do not agree.

---

[14] Although as a general matter, punitive damages are not available in a breach of contract case, B.F. Myers & Son of Goodlettsville, Inc. v. Evans, 612 S.W.2d 912, 916 (Tenn. Ct. App. 1980), punitive damages may be awarded in such a case under certain circumstances. See Se. Greyhound Lines, Inc. v. Freels, 144 S.W.2d 743, 746 (Tenn. 1940); Louisville, Nashville & Great S.R.R. v. Guinan, 79 Tenn. 98, 1883 WL 3669, at *2 (1883). However, an award of punitive damages is limited to "the most egregious cases" and is proper only where there is clear and convincing proof that the defendant has acted either "intentionally, fraudulently, maliciously, or recklessly." Goff v. Elmo Greer & Sons Constr. Co., 297 S.W.3d 175, 187 (Tenn. 2009) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992)).

[15] As we have discussed herein, outrageous conduct is properly referenced as an element of the tort of intentional infliction of emotional distress, not a separate tort.

The record confirms that the trial court's award of punitive damages was not based on breach of contract. The trial court in its memorandum opinion of February 18, 2010, while discussing "the tort of outrageous conduct," stated that "if the law is that . . . I cannot award damages on outrageous conduct, then obviously I can't get to punitive damages." It is apparent that the trial court determined that it was precluded from awarding punitive damages absent a finding that the proof established what the court identified as the tort of outrageous conduct and that it could not award punitive damages based on breach of contract. Therefore, the necessary implication is that no portion of the trial court's award of punitive damages was based on breach of contract. Moreover, the evidence in the record fully supports the conclusion that an award of punitive damages is unwarranted in this case because the conduct of the defendants here cannot be said to be among "the most egregious of wrongs." Sanford v. Waugh & Co., 328 S.W.3d 836, 849 (Tenn. 2010) (quoting Hodges, 833 S.W.2d at 901)); Goff, 297 S.W.3d at 196 (same). Because we affirm the Court of Appeals' ruling that Ms. Rogers failed to prove intentional infliction of emotional distress, we likewise affirm its judgment reversing the trial court's award of punitive damages.

**IV.**

The next issue we address is whether Ms. Rogers may recover an award for attorney's fees. Tennessee is among the majority of jurisdictions following the "American rule," which provides that a party to a civil suit may not recover attorney's fees unless there is either a contractual or statutory provision specifically allowing attorney's fees or some other recognized exception to the rule applies. Cracker Barrel Old Country Store, Inc. v. Epperson, 284 S.W.3d 303, 309 (Tenn. 2009) ("'[T]he American rule reflects the idea that public policy is best served by litigants bearing their own legal fees regardless of the outcome of the case.'") (quoting House v. Estate of Edmondson, 245 S.W.3d 372, 377 (Tenn. 2008)).

Ms. Rogers argues that a statutory provision—Tennessee Code Annotated section 46-2-307—entitles her to an award of attorney's fees. We do not agree. Section 46-2-307 (transferred to Tenn. Code Ann. § 46-1-305) is a portion of the General Cemetery Act of 1968. Tenn. Code Ann. §§ 46-1-101 to -2-411 (2000). Part 3 of this title requires a cemetery to establish an improvement care trust fund by deposit of a specified percentage of cemetery sales proceeds. Tenn. Code Ann. § 46-2-302. Only sections 46-2-305 (currently section 46-1-205) and 46-2-306 (currently section 46-1-304) allowed Ms. Rogers to pursue a private cause of action as a lot owner against Louisville Land Company to recover monies on behalf of the improvement care trust fund. Section 46-2-305 prohibits the payment of a dividend, salary, or compensation to a stockholder, officer, director, or owner of a cemetery company until an improvement care trust fund is set up that meets statutory funding requirements. It further provides that any such prohibited payments "shall be recoverable at the suit of . . . any lot owner" and the "proceeds of such suit or claim shall be added to the improvement care

trust fund to assist in making it current." Id. at § 46-2-305. Section 46-2-306 also pertains to the improvement care trust fund and provides that the officers and directors of a cemetery company who fail to properly set up the trust fund "shall be jointly liable at the suit of a lot owner . . . for the difference between the amount of the improvement care trust fund as set up by the company and what it should be if set up under the terms of § 46-2-302" and further provides that "[a]ny recovery under this section or § 46-2-305 shall be for the use of the company and shall be paid into the improvement care trust fund, so as to bring it up to the required amount." Id. at § 46-2-306.

Section 46-2-307, the statutory provision under which Ms. Rogers seeks attorney's fees, provides that "the suitor who . . . brings suit and recovers from a stockholder, director or officer of a company shall also recover reasonable attorney's fees . . . ." "Suit" as used in section 46-2-307 refers to a suit to enforce requirements pertaining to the improvement care trust fund. Although Ms. Rogers' original complaint did not specifically cite either section 46-2-305 or section 46-2-306, it cited section 46-2-302 and alleged that the defendants had failed to properly maintain the cemetery trust fund. At close of proof, however, Ms. Rogers' attorney announced that she had decided to abandon her cause of action regarding the trust fund.

Even though she abandoned her trust fund claim at trial, Ms. Rogers contends that she should be awarded attorney's fees under section 46-2-307 "because of her service as petitioner in the District Attorney's suit." She argues that an action by the attorney general under section 46-2-306(b)(1) "requires the participation of at least one private individual to serve as petitioner" and that she participated as this "indispensable" private petitioner, without whom the district attorney would not have had a cause of action. She argues that it would be "tyrannical" if the statute were deemed to "require the District Attorney to drag a private individual into court to assist in the prosecution of a civil lawsuit without providing the petitioner even the possibility of some sort of compensation for her efforts."

Ms. Rogers' argument relates to section 46-2-306(b)(1), which allows the district attorney to pursue a cause of action against a cemetery company for failure to properly maintain the improvement trust care fund upon the petition of a minimum number of lot owners:

> [t]he district attorney general in whose district a cemetery is situated may bring an action in chancery court to remedy any violation of this section on the petition of ten percent (10%) of, or five hundred (500), lot owners and next of kin of lot owners, whichever is less; provided, that only one (1) survivor shall be qualified as a petitioner on account of kinship with one (1) deceased person.

Ms. Rogers' reliance on sections 46-2-307 and 46-2-306(b)(1) is misplaced. First, in the language of section 46-2-307, Ms. Rogers was one of the many individuals whose signatures were required as a pre-condition to the attorney general's filing suit, but she was not a suitor in the district attorney general's cause of action. "Suitor" is commonly defined as "[a] party that brings a lawsuit." Black's Law Dictionary 1448 (7th ed. 1999). "Where the statutory language is not ambiguous . . . the plain and ordinary meaning of the statute must be given effect." In re Adoption of A.M.H., 215 S.W.3d 793, 808 (Tenn. 2007). We "'presume that the legislature says in a statute what it means and means in a statute what it says there.'" Gleaves v. Checker Cab Transit Corp., 15 S.W.3d 799, 803 (Tenn. 2000) (quoting BellSouth Telecomms., Inc. v. Greer, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)). The Petition to Enforce Cemetery Maintenance was filed by Jerry N. Estes, District Attorney General, not Ms. Rogers, whose name appears nowhere on the pleading.

Second, Ms. Rogers' assertion that section 46-2-306(b)(1) "specifically requires a private individual to serve as petitioner of the District Attorney's suit and without the private petitioner there can be no action" is not supported by the language of this statute. Rather than a single indispensable private petitioner, the statute requires that the attorney general be petitioned by at least ten percent of or five hundred lot owners and next of kin of lot owners, whichever is less. The district attorney general's suit asserted that it was supported by at least one hundred and sixty-three lot owners or relatives of individuals interred in the cemetery. Ms. Rogers was not the sole indispensable individual upon whose petition the district attorney general's suit was based.

Finally, there is no proof that Ms. Rogers or any other petitioner was "dragged into court" by the district attorney general in order that he might go forward with his claim nor does the language of the statute support such a conclusion. Ms. Rogers was neither a petitioner nor a witness in the trial of the district attorney general's case to enforce proper maintenance of Fort Hill Cemetery.

Having abandoned her cause of action for improper maintenance of the trust fund, Ms. Rogers is precluded from seeking an award of attorney's fees under section 46-2-307 through the petition of the district attorney general. The judgment of the Court of Appeals reversing the trial court's award of attorney's fees is affirmed.

## V.

Next, we address the issue of whether Mr. Williams should be held personally liable to Ms. Rogers for breach of contract. Ordinarily, a shareholder of a corporation is not personally liable for the acts of the corporation. See Oceanics Sch., Inc. v. Barbour, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003) ("A corporation is presumptively treated as a distinct

entity, separate from its shareholders, officers, and directors.") (citing Schlater v. Haynie, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991)). In appropriate circumstances, however, the corporate veil may be pierced and the acts of a corporation attributed to a shareholder. CAO Holdings, Inc. v. Trost, 333 S.W.3d 73, 88 (Tenn. 2010). "The corporate entity generally is disregarded where it is used as a cloak or cover for fraud or illegality, to work an injustice, to defend crime, or to defeat an overriding public policy, or where necessary to achieve equity." 18 Am. Jur. 2d Corporations § 57 (2004) (footnotes omitted).

The party seeking to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to relief. Barbour, 112 S.W.3d at 140. In order to pierce the corporate veil, the proof must show that "the separate corporate entity 'is a sham or a dummy' or that disregarding the separate corporate entity is 'necessary to accomplish justice.'" Trost, 333 S.W.3d at 88 (quoting Barbour, 112 S.W.3d at 140). The question of whether the corporation's separate identity should be disregarded is dependent on the specific circumstances of the case and is a "'matter . . . particularly within the province of the trial court.'" Barbour, 112 S.W.3d at 140 (quoting Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp., 691 S.W.2d 522, 526 (Tenn. 1985)). When determining whether the corporate veil should be pierced, the following factors are applicable:

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

Trost, 333 S.W.3d at 88 n.13 (quoting FDIC v. Allen, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)). No single factor among those listed is conclusive, nor is it required that all of these factors support piercing the corporate veil; typically, courts will rely on a combination of the

factors in deciding the issue. Barbour, 112 S.W.3d at 140. However, in all events, the equities must "substantially favor" the party requesting relief, Trost, 333 S.W.3d at 89, and the presumption of the corporation's separate identity should be set aside only "with great caution and not precipitately." Schlater, 833 S.W.2d at 925.

In its memorandum opinion, the trial court identified Mr. Williams as the alter ego of Louisville Land Company and awarded Ms. Rogers damages in the amount of $250 for breach of contract against both defendants. This ruling implies that the trial court concluded that it was proper to pierce the corporate veil. The trial court did not, however, set forth any specific findings that led it to that conclusion, nor did the court reference any of the Allen factors as pertinent to its analysis. The Court of Appeals reversed the trial court's award of damages for breach of contract against Mr. Williams personally, determining that the record did not support a finding that "the separate corporate entity 'is a sham or dummy' or that disregarding the separate corporate entity is 'necessary to accomplish justice.'" Rogers, 2011 WL 2112766, at *7 (quoting Trost, 333 S.W.3d at 88). Ms. Rogers argues that the Court of Appeals' conclusion was in error and that the trial court properly pierced the corporate veil to hold Mr. Williams personally liable. We do not agree.

Since the trial court made no specific findings of fact to support its conclusion that Mr. Williams is the alter ego of Louisville Land Company, we review the record de novo to determine whether the evidence preponderates in favor of the trial court's conclusion. Ganzevoort, 949 S.W.2d at 296. We begin by considering various factors that Ms. Rogers contends support disregarding the corporation as a separate entity and holding Mr. Williams personally liable.

First, Ms. Rogers notes that Mr. Williams was the sole shareholder of Louisville Land Company. However, although "the sole ownership of stock by one individual" is one of the factors that should be considered in granting the relief she requests, it is not solely determinative. Even if one stockholder holds all of the stock in a corporation, the corporation and that single stockholder remain "distinct legal entities." Hadden v. City of Gatlinburg, 746 S.W.2d 687, 689 (Tenn. 1988).

Ms. Rogers next argues that Mr. Williams dominated Louisville Land Company and notes that he decided when maintenance of the cemetery would occur, decided whether a complaint about cemetery maintenance would be ignored, contracted with individuals to perform maintenance work on the cemetery, and was responsible for writing cemetery maintenance work paychecks, which were only issued when he was available. However, there is no proof that any of these acts were not performed for the benefit of Louisville Land Company or that any of these acts were inconsistent with Mr. Williams' responsibility as president of Louisville Land Company to maintain the cemetery. As noted in Schlater, a

corporation inherently must act through its officials, with some person or persons controlling and executing the corporation's actions and "[t]here is no general rule that stockholders, directors or officers of a corporation are liable for its debts merely because they controlled or 'dominated' the corporation." 833 S.W.2d at 924.

Finally, Ms. Rogers asserts that Mr. Williams supplied personal funds to help cover cemetery maintenance costs. Even if we were to construe such conduct as a commingling of personal funds with those of the corporation, there is no proof as to what amount of Mr. Williams' monies were used to pay corporate debt or with what frequency this was done. Accordingly, there is no means of determining what weight this proof should be accorded. The mere fact that Mr. Williams used his own money in an unestablished amount to pay corporate debt is not sufficient to warrant the relief Ms. Rogers seeks.

Ms. Rogers does not allege misuse of the corporate form or that the corporate entity "has been used to work a fraud or injustice in contravention of public policy" and asserts no combination of the Allen factors sufficient to support her argument that the corporate entity should be disregarded. The equities must "substantially favor" the party requesting that the corporate veil be pierced, and under the circumstances of this case, they do not. The trial court's ruling that pierced the corporate veil was not supported by the evidence and was properly reversed by the intermediate court.

**VI**.

In conclusion, we reverse the judgment of the trial court awarding Ms. Rogers compensatory damages in the amount of $45,000, punitive damages in the amount of $250,000, and attorney's fees in the amount of $37,306.25, and the trial court's judgment holding Mr. Williams personally liable for breach of contract in the amount of $250. The judgment of the Court of Appeals is affirmed. Costs on appeal are assessed to the Appellant, Betty Saint Rogers, for which execution may issue, if necessary.

_____
SHARON G. LEE, JUSTICE

-21-