NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0441n.06

No. 18-6323

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 21, 2019
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| EVA A. WEBB WRIGHT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| PENGUIN RANDOM HOUSE, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellee. | ) | |

**BEFORE:** **GRIFFIN, BUSH, and READLER, Circuit Judges.**

**CHAD A. READLER, Circuit Judge.** Many are intimately familiar with the best-selling *Fifty Shades of Grey* trilogy. Much less so the online memoir *LadyHawk's Life*, published by Plaintiff Eva Wright. Yet Wright says the two are bound together.

According to Wright, *Fifty Shades* is the product of fact, not fantasy. She says it was her personal memoir that inspired *Fifty Shades*, but her personal story was misappropriated by Defendant Penguin Random House. As a result of *Fifty Shades*'s success, Wright claims to have experienced significant pain—both physical and financial. So she filed this *pro se* lawsuit, seeking to punish Penguin for its alleged misappropriation.

The district court dismissed Wright's claims, some of them because they are state-law tort claims preempted by the Copyright Act, and others because they failed to state a claim upon which relief could be granted. Now represented by counsel, Wright challenges that decision. We agree with the district court and thus **AFFIRM**.

## I.  BACKGROUND

According to her complaint, beginning in 1995, Wright published her memoir, *LadyHawk's Life*, on a website she created.  In her memoir, Wright revealed stories about her life and overcoming abuse.  And it is those stories, she claims, that formed the basis of the enormously popular *Fifty Shades of Grey* trilogy published by Penguin in 2011 and 2012.

Wright accuses Penguin of "pirat[ing]" her story, publishing it without her consent, and then depriving her of any portion of the "billions of dollars" ultimately generated by the trilogy.  In addition to losing out on the profits from the sales of *Fifty Shades*, Wright also asserts that the stress from these events has caused her physical injuries.

Wright's allegations trace back to 2005, ten years after she began publishing her memoir online.  That year, she says she received an email from Amanda Hayward, the now-publisher of the digital versions of *Fifty Shades*, asking if Wright's stories were real.  This interaction, Wright claims, by itself shows that Penguin was aware of her writings well before it published the *Fifty Shades* trilogy.

Sometime later, but before publication of the trilogy, Wright states that she self-published her memoir through "third party publishing companies of Lulu and Amazon."  As proof, Wright provides a copy of the Amazon Author Central Page that included her memoir, *Ladyhawk's Life (Volume I)*.  We take her allegations as true at this threshold stage and will assume that Wright did in fact publish her work on Amazon, although we are not told when.  What we do know, based upon the Amazon submission, is that Wright's memoir ranked number 16,496,417 in sales.  In fact, she appears to have sold just a single copy of the memoir, in 2013.  Despite *Ladyhawk's* limited exposure, Wright alleges that her publication likely inspired the *Fifty Shades* trilogy.

Wright contacted Penguin about her concerns in 2015, and Penguin denied any relationship between *Fifty Shades* and Wright's memoir. Penguin explained that Wright's pirating claim "was impossible" and that its client had never visited Wright's site. Nonetheless, Wright claims that the *Fifty Shades*'s author cyberstalked her through Facebook.

In addition to these claims, Wright also notes that *Ladyhawk's Life* and *Fifty Shades* contain unmistakably similar details. To demonstrate these "similarities," Wright provides numerous side-by-side comparisons of the two works. But to see any resemblance between the two works requires a vivid imagination:

> *Ladyhawk's Life*: While sleeping I had a dream that I was riding on a train and fell off and accidentally broke both of my legs and my arm. I felt helpless and trapped. I was scared and alone. Beer makes you think and dream about weird shit.

> *Fifty Shades*: I wake with a jolt. I think I've just fallen down some stairs in a dream, and I bolt upright, momentarily disoriented. It is dark, and I'm in Christian's bed alone.

(quotations as alleged by Wright). Another purported example involves chance encounters between the main characters in each respective publication. Compare, says Wright:

> *Ladyhawk's Life*: My Prince drove by Jun 1, 2002 If there was such a thing as a Prince. And that prince drove a truck. And that truck was blue. And it passed by my house. Then wishes really do come true. What is the doing in my neighborhood?

> *Ladyhawk's Life*: blechk Jun 27, 2002 I still can't figure out why he stopped by here.

> *Ladyhawk's Life*: Why is my Prince passing my house? Jul 5, 2002 What I am wondering is why is he coming by my house after all of this time has passed?

With:

> *Fifty Shades*: What the hell is he doing here?

> *Fifty Shades*: *Why is he in Portland? Why is he here at Clayton's?*

(quotations as alleged by Wright).

Wright points to other aspects of the two publications that also arguably rope the two together. But they too hardly show much of a connection, as these purported commonalities are at the most general level. To give two examples, Wright herself and the titular character from *Fifty Shades*, Christian Grey, share the same eye color, and Grey and Wright's husband share the same birthday month. Adding all of this together, Wright says, these events demonstrate that Penguin, its employees, and the author of the *Fifty Shades* trilogy knew about her works, copied them, and profited as a result.

On February 27, 2018, Wright filed a *pro se* complaint seeking damages for lost royalties as well as physical and emotional harm. She also sought an injunction against further sales of the *Fifty Shades* trilogy, seeking to restrain Penguin from making additional wrongfully earned profits. Understandably, given Wright's *pro se* status, the allegations in her complaint were at times difficult to make out. Penguin moved to dismiss the complaint on that ground and others. Rather than having the case delayed by efforts to replead, both the district court and Penguin generously construed Wright's causes of action as: (1) violation of her statutory right of publicity, (2) tortious interference with contractual relations and/or prospective business relations, (3) commercial misappropriation, (4) copyright infringement, (5) harassment, and (6) negligent and intentional infliction of emotional distress.

In assessing those claims, the district court properly recognized that the United States Copyright Act in many ways ties the hands of those asserting state-law "piracy" claims. The Copyright Act, after all, expressly preempts such claims. Accordingly, the district court dismissed the state-law causes of action that were based upon Penguin's alleged misuse of Wright's memoir. Turning to the Copyright Act, Wright also failed to state a claim under that Act, the district court concluded, because she never claimed to possess a registered copyright or a pending copyright

registration application. Finally, the court dismissed as inadequately pled Wright's state-law claims for negligent and intentional infliction of emotional distress and malicious harassment. This appeal followed.

## II. ANALYSIS

We review de novo the district court's decision to dismiss Wright's complaint. *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017). To survive a motion to dismiss, a civil complaint must contain sufficient facts that, taken as true, state a plausible claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). With good reason, pleadings drafted by *pro se* litigants are held to less stringent standards and should be liberally construed. *Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004). But they are not exempt from the requirements of the Federal Rules of Civil Procedure. *See Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 376 (6th Cir. 2006) (citing *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)).

## A.    Several Of Wright's State-Law Claims Are Preempted By The Copyright Act.

Did the *Fifty Shades* trilogy wrongly copy aspects of Wright's life story? Wright maintains that it did, and she filed a host of claims to recover for that alleged misdeed. She asserts that Penguin violated the Tennessee right of publicity statute and also engaged in the state-common-law torts of (1) interference with contractual relations or prospective business relations and (2) commercial misappropriation. Although Wright's allegations rely on language from state-law causes of action, many seek relief sounding in copyright. Accordingly, we must first determine whether any of Wright's claims are preempted under § 301(a) of the Copyright Act.

The Copyright Act has well-settled preemptive force over certain types of state-law claims. *See Ritchie v. Williams*, 395 F.3d 283, 285–86 (6th Cir. 2005). State-law claims preempted by the

Copyright Act share two qualities. First, the claim must involve a work within the "subject matter of copyright." *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453–54 (6th Cir. 2001) (quoting 17 U.S.C. § 301). In other words, the intellectual property at issue must be eligible for copyright protection. Wright's claims meet this subject-matter requirement. Her memoir is an original literary work "fixed in [a] tangible medium of expression" and therefore falls within the range of materials protected by the Copyright Act. 17 U.S.C. § 102(a); *see Stromback v. New Line Cinema*, 384 F.3d 283, 300–01 (6th Cir. 2004). Resisting that conclusion, Wright suggests that her memoir merely articulates "ideas," which are not in the scope of § 102(b) of the Copyright Act. Yes, § 102(b) distinguishes between concepts that are too general to be afforded copyright protection on the one hand, and those specific enough to qualify for protection on the other. 2 W. Patry, Copyright § 4:30 (2019). But Wright's publication is much more the latter.

In addition to involving a work that falls within the scope of the copyright laws, the underlying state-law claim must also be the equivalent of one of the exclusive rights within the scope of federal copyright protection. *Stromback*, 384 F.3d at 301. To determine equivalency, we apply a "functional test," one that asks whether the state claim seeks to protect rights similarly protected by the Copyright Act. *Id.* (citing *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1164 (1st Cir. 1994)). We ask whether the conduct that allegedly violated the right at the core of the state-law claim is also conduct that infringes on a right protected by the Copyright Act. If the rights at issue are functionally the same, the state-law claim is preempted. That is true even where the state cause of action contains slightly different elements. *See, e.g.*, *id.* at 302; *Wrench LLC*, 256 F.3d at 453.

Wright's tortious interference, commercial misappropriation, and publicity claims also satisfy this equivalency test. Courts commonly find claims like these to be preempted by the

Copyright Act. *See, e.g.*, *Stromback*, 384 F.3d at 301–02 (finding claims for both commercial misappropriation and tortious interference preempted by the Copyright Act); *Ray v. ESPN, Inc.*, 783 F.3d 1140, 1144 (8th Cir. 2015) (finding claims for tortious interference and publicity preempted); *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1144 (9th Cir. 2006) (finding publicity claim preempted). So too here. All three causes of action depend "on [Penguin's] alleged use of her original work without permission or compensation." *Wright v. Penguin Random House*, No. 1:18-CV-38, 2018 WL 6004664, at \*3 (E.D. Tenn. Nov. 15, 2018). Wright, in fact, says much the same thing. The bulk of her complaint focuses on the "piracy of [her] non-fiction memoir" and whether a conversation with Hayward constituted "a license to use or sell more than hundreds of millions of copies of [a] story as their own work of fiction." As unauthorized publication is a core and exclusive right safeguarded by the Copyright Act, the district court correctly held that Wright's claims are preempted.

**B.      Wright Failed To Plead Sufficiently Her Remaining Causes Of Action.**

*1. Wright Cannot Bring Suit Under The Copyright Act Because She Does Not Have A Valid Copyright.*

Although Wright did not expressly plead a copyright infringement claim, the essence of her claims, both in the complaint and on appeal, are for copyright infringement of her memoir. Viewing these claims under the Copyright Act, to establish a claim of copyright infringement, Wright must show (1) that she owns a valid copyright and (2) that Penguin copied protectable elements of the copyrighted work. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004) (citations omitted). Wright's complaint fails the first hurdle—that she maintain a copyright registration or have a copyright preregistration. That allegation must appear on the face of a well-pleaded complaint. 17 U.S.C. § 411(a). But it is absent here. Wright has not alleged that she has

either applied for or received copyright registration for her memoir. Accordingly, the district court properly dismissed her claim for copyright infringement.

> 2. *Wright Does Not Allege That Penguin Engaged In Actions Amounting To Harassment Or Infliction Of Emotional Distress.*

Wright also does not allege facts sufficient to support claims of malicious harassment or negligent or intentional infliction of emotional distress. These claims hinge on Wright's allegations that: (1) she contacted Penguin and informed it about her infringement claims, to which Penguin responded that it was "impossible;" (2) she experienced hair loss and lesions induced by the stress she has felt over the perceived theft of her work; and (3) she was "cyberstalked" by the author of the *Fifty Shades* trilogy through Facebook.

To overcome a motion to dismiss, a claim for malicious harassment under the Tennessee Human Rights Act must allege three things: that (1) a person acted maliciously to (2) unlawfully intimidate another from the free exercise or enjoyment of a constitutional right by (3) injuring or threatening to injure or coercing another person or by damaging, destroying, or defacing any real or personal property of another person. *Washington v. Robertson County*, 29 S.W.3d 466, 473 (Tenn. 2000). In addition, as the Tennessee Human Rights Act was enacted to address hate crimes perpetrated against certain minority groups, Tennessee courts have limited consideration of claims under the Act to instances of intimidation motivated by another's "race, color, ancestry, religion or national origin." *Id*. at 469; *Bowman v. City of Memphis*, 329 S.W.3d 766, 768–69 (Tenn. Ct. App. 2010).

Wright's malicious harassment claim against Penguin fails many times over. The main conduct she complains of—"cyberstalking"—does not even involve Penguin; she attributes this activity to Penguin's client and her family. As for Penguin, its only communication with Wright was initiated by Wright, not Penguin. To be sure, Penguin quickly dismissed as impossible

Wright's claim that her memoir was pirated. Perhaps Penguin's response was blunt. But it certainly did not amount to threatening or coercive conduct. *Robertson County*, 29 S.W.3d at 473. And in any event, Wright does not allege that Penguin's conduct was motivated by her race, color, ancestry, religion, or national origin.

Wright's claims of intentional and negligent infliction of emotional distress fare no better. Take her claim for intentional infliction of emotional distress. It requires, among other things, conduct so outrageous that it is not tolerated by civilized society. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012). Penguin's response to Wright's allegations was anything but outrageous. And what about her claim for negligent infliction of emotional distress? For the claim to survive at the outset, Wright must allege the elements of a general negligence claim—duty, breach of duty, causation, and serious or severe emotional injury. *Id.* at 206. Among other shortcomings, she fails to allege that Penguin owed her any duty of care. The district court properly dismissed these claims as well.

### III. CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.