# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
March 9, 2016 Session

## JUDY LANCE d/b/a J&B DISCOUNT v. OWNER'S INSURANCE COMPANY

**Appeal from the Circuit Court for Polk County**
**No. 11CV150      Hon. J. Michael Sharp, Judge**

---

### No. E2015-00274-COA-R3-CV-FILED-MAY 25, 2016

---

This is a breach of insurance contract action for failure to remit payment pursuant to a business-owners policy after the subject property was destroyed by fire. The case proceeded to jury trial. After denying the insurance company's motion for a directed verdict, the court submitted the case to the jury. The jury found that the plaintiff was entitled to recover under the policy and awarded compensatory and punitive damages and prejudgment interest. The jury also imposed a bad faith penalty and damages pursuant to the Tennessee Consumer Protection Act. The insurance company appeals. We affirm in part and reverse in part.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, II, JJ., joined.

N. Mark Kinsman, Hixson, Tennessee, and Gaëtan Gerville-Réache, Grand Rapids, Michigan, for the appellant, Owners Insurance Company.

Robert G. Norred, Cleveland, Tennessee, for the appellee, Judy Lance d/b/a J&B Discount.

## OPINION

## I.      BACKGROUND

Since 1993, Judy Lance d/b/a J&B Discount ("Plaintiff" or "J&B") owned and operated J&B, a retail business offering hardware, household items, and gifts for public purchase. J&B was housed in a prefabricated metal building with approximately 14,000

square feet of heated space. The building and property were secured by a mortgage in favor of People's Bank of East Tennessee ("People's Bank").[1] J&B was also secured by a business owner's insurance policy with Owner's Insurance Company ("Defendant"), a subsidiary of Auto-Owners Insurance Company ("Auto-Owners"). The policy excluded coverage for loss or damage caused by dishonest or criminal acts committed by the insured, partners, employees, or anyone entrusted with the property for any purpose.

In the early morning hours of April 24, 2011, someone intentionally set fire to J&B. When firefighters arrived on the scene, they discovered that the property gates were open, that a truck was blocking an entrance to the building, and that the doors to the building had been locked. The subsequent investigation revealed no sign of forced entry into the building but that propane tanks had been set throughout the store to propel the fire from one side of the building to the other. The building and inventory were completely destroyed by the fire.

Upon learning of the fire, Defendant's field claims representative requested a police report, assigned a cause and origin expert and an independent claims adjuster, and sent Plaintiff various forms for completion. Plaintiff submitted a proof of loss form on June 22, 2011, along with some financial records and a customized authorization form. Defendant rejected the initial form and advised Plaintiff by letter that she had listed an incorrect deductible amount and prematurely estimated the amount of damages. Plaintiff submitted a corrected form on August 20, 2011, and also advised Defendant that Tennessee Code Annotated section 56-7-105, commonly referred to as the bad-faith statute, would apply if Defendant failed to act pursuant to the statute.

Having received no response from Defendant concerning her corrected proof of loss form, Plaintiff filed suit on October 18, 2011, alleging breach of contract, bad faith refusal to pay, and violation of the Tennessee Consumer Protection Act ("the TCPA").[2] Plaintiff sought compensatory and punitive damages, prejudgment interest, imposition of a bad faith penalty, and damages pursuant to the TCPA. Defendant denied wrongdoing and asserted the affirmative defense of arson, claiming that its refusal to pay was justified by its good faith belief that Plaintiff caused the fire. In support of its defense, Defendant cited the suspicious circumstances of the fire and Plaintiff's financial distress.

The case proceeded to a jury trial. Plaintiff, who was 65 years old at the time of trial, testified that she purchased an unimproved lot on Highway 64 to house the site of her retail store, J&B. She expanded the building and her inventory available for purchase

---

[1] Appalachian Community Bank ("Appalachian") was the primary mortgage holder until 2010, when People's Bank purchased Appalachian from the Federal Deposit Insurance Corporation.

[2] People's Bank joined in the action as a mortgagee-payee. The jury rendered a verdict in favor of People's Bank, and any remaining issues following trial were settled and are not at issue on appeal.

throughout the years. She offered a number of hardware items for purchase, including bench grinders, cherry pickers, and water heaters. She purchased the majority of the hardware items from House-Hasson in Knoxville, Tennessee. She received deliveries from the wholesale distributor twice weekly. She also sold household products, e.g., cleaning supplies and specialty gifts, and offered propane tanks for exchange. The propane tanks were housed in a locked cage outside the store.

Plaintiff identified a 1040 form from her 2004 federal tax return in which she claimed a beginning inventory of $89,461 and an ending inventory of $98,932. She asserted that the beginning and ending inventory claimed on her tax return was inaccurate because she underreported her inventory based upon advice she received from her ex-husband, Bill Prince. She stated, "I only inventoried stuff that I had not - - what I had left over from the previous year. Just the year that - - for that year." She provided that she conducted inventory on a quarterly basis but claimed that her records burned in the fire. She acknowledged that her insurance premium was sufficient for inventory valued in excess of $500,000.

Plaintiff acknowledged that her sales, inventory purchases, and net income decreased as a result of the economic downturn in 2008. She agreed that her recent tax returns reflected a net income of approximately $10,000 per year. Despite the decline in the business, she testified that she was proud of her success in growing her business and that she worked approximately 50 hours per week to meet the needs of her customers, some of whom became her friends. She stated that she hosted a customer appreciation day each July and provided free food and soft drinks for her customers and employees. She employed three to four employees on a rotating basis. At various times, she also employed family members, including her daughter, Sherry Sosebee, and former daughter-in-law, Lisa Gaddis Carder.

Plaintiff testified that she had maintained coverage with Defendant since opening her store. She submitted one claim in the 18 years that she held coverage and requested an increase in coverage 10 years before the fire. Defendant also automatically increased her coverage as her business expanded. Her policy was changed in April 2011 to reflect that her business was a sole proprietorship, not a partnership. She discovered the error when she was at the office to sign paperwork. When asked whether she and her ex-husband Bill Prince founded the store as partners, she claimed that she originally sought to partner with her brother, Bill Mull, who lived in Georgia. Instead, she founded the business as a sole proprietor at the advice of Mr. Prince. She acknowledged that her divorce decree contained a provision concerning Mr. Prince's potential ownership of J&B. She explained that she had been advised to divest him of any potential interest because she founded the business during their marriage.

Relative to the fire, Plaintiff testified that she worked on Saturday, April 23, with one employee, Barbara Gribble, who left around 5:00 p.m. Plaintiff's husband, Anthony Lance, arrived in his dually truck shortly thereafter to retrieve a pickup truck that was generally used to haul refuse around the property. Mr. Lance routinely retrieved the truck and filled it with gas. She recalled locking the building and the property gates before leaving in her car, while Mr. Lance left at the same time in the pickup truck. The dually truck was left on the property. She asserted that they drove home, where they remained until the next morning.[3] She claimed that she first discovered the fire when she arrived at work around 9:30 a.m.

Plaintiff denied any involvement in the fire and claimed that in February 2011, her son, Jeffrey Holden, threatened to set fire to J&B.[4] She surmised that his threat was in reaction to a lawsuit she filed against him to reclaim ownership of a truck. At the time of the fire, Mr. Holden was living with Ms. Carder, who once possessed a key to J&B. His business had also been destroyed by fire years earlier. She acknowledged that she did not advise Defendant of the threat until shortly before trial for fear of harming her son.

Plaintiff identified her initial proof of loss form, dated June 22, 2011, in which she requested payment of $500,000 for the building, $691,690 for the loss of her inventory, and $25,000 per month in business interruption damages. She identified a corrected form, dated August 20, 2011, in which she left the requested damage amounts blank. She testified that she also provided additional documentation and an authorization form, permitting Defendant to inspect her financial records. Defendant never approved or denied her corrected proof of loss form or provided her with business interruption damages. She relied on Mr. Lance and a new small business venture for financial support. Her indebtedness steadily increased because the income from her new venture proved unsuccessful to meet her current financial obligations.

Mr. Lance testified that his numerous ailments prevented him from assisting Plaintiff in her daily operation of the store. He estimated that Plaintiff spent 60 to 70 hours per week at J&B and that she spent the remainder of her time assisting him. He described her affection for the store and her dedication to her customers. He acknowledged that business had "calmed down" following the 2008 economic downturn. He recalled that Plaintiff reduced her staff and that her profits and purchase orders

---

[3] Ms. Gribble claimed that Plaintiff and Mr. Lance made plans to attend her daughter's birthday party following work on April 23, 2011. She recalled that Plaintiff was late to the party and that Mr. Lance did not attend due to an alleged sickness.

[4] Carl Richard Sawyer, who performed manual labor for Plaintiff at various times, confirmed Plaintiff's account. He claimed that Plaintiff was visibly upset following a telephone conversation with Mr. Holden and that she told him that Mr. Holden had threatened to burn the store down. Mr. Lance also testified concerning Plaintiff's tumultuous relationship with her son.

steadily declined and had not increased by 2010. Nevertheless, he insisted that beginning in 2010, "[t]hings were starting to look better than it had been."

Mr. Lance confirmed Plaintiff's testimony that he came to the store on April 23 to exchange vehicles. He parked his dually truck in its usual spot and left the keys in the store for Plaintiff to use the next day. He then retrieved the pickup truck and left the premises between 6:15 and 6:30 p.m. He claimed that he and Plaintiff returned home, where they remained until she left the next morning.

Mr. Lance testified that he learned of the fire the next morning when Plaintiff called him from J&B. Upon his arrival, he discovered that his dually truck had been moved. He walked around the property and observed smoke rising from the building. He recalled that he and Plaintiff salvaged a few items from the fire. He asserted that they currently relied on income from a reverse mortgage to meet their financial needs.

Plaintiff offered the testimony of several former employees to confirm her dedication to the store and her abundance of inventory in the store. Dana Jones, Sherry Grier, and Sharon Curtis confirmed that Plaintiff maintained a large amount of inventory and described the store as "fully stocked" or "overstocked." They listed a plethora of items available for sale at J&B and described the layout of the store. They believed that Plaintiff was proud of her store and opined that she had dedicated her life to the store.

Ms. Grier and Ms. Curtis confirmed that Mr. Lance often left a vehicle at J&B overnight and identified his preferred parking spot. They also provided that Plaintiff changed the locks when an employee was terminated from his or her position and specifically recalled that the locks were changed after Ms. Carder's employment was terminated. Ms. Curtis recalled overhearing unpleasant conversations between Jeremy Holden and Plaintiff. She testified that her employment was terminated in November 2010, because Plaintiff could no longer afford to pay her.

Ms. Grier also testified that she was present at J&B on the day after the fire. She described Plaintiff as "hysterical." She recalled walking around the property and noticing that most of the items in a storage building had been removed. She agreed that the storage building did not have doors and that anyone could have removed the items. Likewise, Ms. Curtis visited Plaintiff at J&B a few days after the fire. She recalled that two shelves toward the back of the store were empty.

Thomas York testified concerning Plaintiff's purchase of hardware from House-Hasson. He marketed House-Hasson's services as a wholesale distributor to Plaintiff and frequented the store approximately once per week to discuss her inventory needs. He opined that Plaintiff "loved her store" and was there almost every day the store was in

operation. He classified Plaintiff as a "heavy buyer" and opined that she purchased large quantities of items that were unlikely to sell at a fast pace. He identified a letter in which he estimated it would cost $2,000,000 to replace Plaintiff's building, the entire stock of inventory, shelving, and fixtures at the time of the fire. He agreed that his estimate assumed Plaintiff's inventory was entirely comprised of hardware from House-Hasson. He acknowledged that Plaintiff purchased other items from different suppliers.

Mr. York recalled that Plaintiff's purchase orders from House-Hasson had steadily declined since 2008. His record reflected total purchases of $314,462 in 2007; $177,823 in 2008; $161,536 in 2009; and $152,153 in 2010. Her purchases from January through April 23, 2011, were in keeping with the same ratio or volume as 2009. He asserted that Plaintiff had accrued an outstanding balance a few years prior to the fire and that House-Hasson eventually sued her for the remainder of the account balance following the fire.

James Quintrell, a senior vice president for People's Bank, testified concerning Plaintiff's mortgage with People's Bank and his experience as a customer at J&B. He confirmed that Plaintiff was current with her mortgage payments at the time of the fire. He estimated that she now owed approximately $395,000, in addition to attorney's fees and other costs. He claimed to have purchased items from J&B throughout the years on a monthly basis. He described the items available for purchase in the store and claimed that the inventory remained moderate to well-stocked throughout the years.[5] His interactions with Plaintiff led him to believe that she gained enjoyment from operating J&B and was proud of her accomplishments.

As pertinent to this appeal, Ann Castle, who was employed by People's Bank, testified that Plaintiff's loan was transferred to her portfolio after the fire. She confirmed that Plaintiff's payments were current until May 2011. She provided that Plaintiff's indebtedness had increased as a result of Defendant's failure to remit payment to People's Bank as a third-party beneficiary to the insurance contract. She acknowledged that Plaintiff had been placed on a past due list and that People's Bank had also filed suit against Plaintiff to recover the amount owed on the mortgage.

Joan Schmitt testified that she was employed by Thomas Insurance Agency and worked as an assistant in the property and casualty insurance department. Her office sold insurance through at least seven or eight different companies, including Defendant. She identified Plaintiff's application for insurance, dated October 26, 1993, in which Plaintiff, along with Bill Prince, sought to procure insurance coverage for J&B through Auto-Owners. She agreed that the participation of both parties implied that J&B was a partnership "of some sort" but noted that Plaintiff indicated on the application that J&B

---

[5] Likewise, Mr. Sawyer estimated that it would take several days to load and transport the inventory housed in J&B and asserted that the inventory had not decreased in the weeks prior to the fire.

was an individual entity, not a partnership. She recalled that Plaintiff called the office in April 2011 to advise her that J&B was a sole proprietorship, not a partnership.

Ms. Schmitt testified that Plaintiff's coverage was transferred to Defendant as a result of Plaintiff's enrollment in the premiere program in 2010. Plaintiff qualified for the program based upon her longevity with the company, payment history, and the fact that she had not filed a claim. She agreed that Plaintiff's coverage had increased throughout the years. Plaintiff, like any other client, was required to submit a request for an increase in coverage through her office, not Defendant. Her office, in turn, would have requested an endorsement from Defendant, who could order an inspection of the inventory and premises to determine whether additional coverage was necessary. She provided that neither she nor Defendant would have requested to inspect Plaintiff's tax returns to set the appropriate amount of coverage. She agreed that Plaintiff was required to maintain coverage commensurate to 80 percent of the total replacement cost or risk incurring a penalty upon filing a claim. She provided that in 2008, Defendant estimated that it would cost $1,110,600 to replace the building.

Caroline Holtshouser, who possessed 40 years of experience in the insurance industry, testified that she was employed by Defendant from 2002 through 2012 as a field claims adjuster. She was responsible for investigating property claims and determining the coverage amount owed to each client. She was the initial investigator assigned to Plaintiff's claim in 2011. She recalled requesting the police report and providing Plaintiff with a proof of loss form, inventory forms, and an authorization form, allowing her to investigate Plaintiff's finances. She also assigned a cause and origin expert to investigate the cause of the fire, an independent adjuster to investigate the claim and estimate the amount due to Plaintiff, an electrical engineer to determine whether the fire was caused by faulty wiring, and an accounting firm to estimate the amount owed to Plaintiff for business interruption damages. She hired an independent adjuster because she was investigating a number of claims at that time due to the destructive storm season.

Ms. Holtshouser testified that Plaintiff's initial proof of loss form was rejected due to clerical errors and that Plaintiff had not submitted the required authorization form. Instead, Plaintiff submitted a customized form that was not commensurate with the form provided by her. She agreed that the second proof of loss form had not been accepted or denied before she was placed on medical leave and the claim was reassigned to Donald Craig Huff.[6] She was on medical leave from January 2012 through August 2012, with

---

[6] Mr. Huff testified by deposition on May 16, 2012, as Defendant's designated representative pursuant to Rule 30(b)(6) of the Tennessee Rules of Civil Procedure. His testimony was read into the record. Mr. Huff was assigned to the case two days before the deposition. He confirmed that the claim remained subject to review but could not provide any explanation as to why Defendant had not accepted or denied

the exception of a two-week period in March. She eventually retired on September 1, 2012. She provided that the claim could not be approved until the investigation was complete. She claimed that Plaintiff did not submit the required inventory list until after she had been placed on medical leave.

As pertinent to this appeal, Patricia Janack, who possessed approximately 23 years of experience in the insurance industry, testified that she is employed by Defendant as a claims branch manager in Knoxville, Tennessee. She was assigned as the claims adjuster for Plaintiff's claim when Mr. Huff relinquished his employment with Defendant in July 2014. She confirmed that Ms. Holtshouser hired a number of people to investigate the claim, namely an independent claims adjuster, a cause and origin expert, an electrical engineer, and an accounting firm. The independent adjuster and cause and origin expert were hired in April 2011. She provided that the electrical engineer reported that the fire was not caused by faulty wiring and that the cause and origin expert initiated a report confirming that J&B was destroyed by arson. The investigation revealed that Plaintiff's mortgage payments were current and that Plaintiff did not have a criminal history and had not been suspected of arson prior to the J&B fire.

Ms. Janack agreed that Defendant could have awarded business interruption damages, while reserving the right to issue a formal response to the entirety of the claim. She stated that Plaintiff's recovery of business interruption damages would likely have been limited to $10,000 based upon her reported net income for the previous year. She asserted that Defendant could not approve a claim for lost inventory without investigating the amount of inventory actually held at the time of the loss. She identified Plaintiff's inventory forms, which reflected a loss of $387,404. She stated that Plaintiff used customized forms and did not submit the forms for inspection until April 2012. She provided that she, along with Ms. Holtshouser and Mr. Huff, were required to report to the home office before taking action on the claim because the claim was in excess of $30,000. She explained that Rob Ellis would have made the final decision concerning the claim. She agreed that Plaintiff's claim had not yet been accepted or denied.

James Brian Young, who possessed 24 years of experience as a claims adjuster, testified that he owned and operated Young & Beeler Adjusting Company, LLC. On April 26, 2011, he was hired by Defendant as an independent claims adjuster to investigate Plaintiff's claim. He recalled contacting Plaintiff and visiting the scene that same day. Following his investigation, he filed a report on June 3, 2011. His report estimated a total potential loss of $2,087,290, representing a loss of $1,295,400 for the building, $691,890 for personal property, and $100,000 in business income. He provided

the claim. He asserted that the fire had been intentionally set and that the investigation was ongoing. He could not identify any facts that would support a finding that Plaintiff committed arson.

that the building and inventory, with the exception of a few items housed outside the building, were completely destroyed.

Michael Shryock, who was accepted by the trial court as an expert witness in his field, testified that he was employed by RGL Forensics as a senior manager in the forensic accounting department. He and his department were hired by Defendant in May 2011 to determine the value of Plaintiff's lost inventory and investigate her financial condition at the time of the fire. In generating his final report, he reviewed Plaintiff's tax returns from 2007 through 2010, credit card statements, sales and use tax filings, bank statements, and the inventory list she provided to Defendant in support of her claim. He testified that his investigation revealed that Plaintiff's poor financial condition supported a motive to commit arson and that she had overstated the amount of her inventory loss.

Relative to her financial condition, Mr. Shryock estimated that Plaintiff's net profit declined at a rate of 77 percent from 2007 through 2010 and that her sales had declined at a rate of 50 percent from 2008 through 2010. Her December 2010 and January 2011 sales were her lowest reported sales. Her business checking account balance was $30.34 in the two weeks prior to the fire, she had nearly reached her credit limit for Sam's Club and Discover Card, she had been charged with numerous insufficient fund fees by her bank, and she owed approximately $298,000 on J&B's mortgage and $222,000 on her home mortgage. Her reported income was approximately $800 per month, and her reported expenses were $3,000 per month. He agreed that her mortgage payments were current and that she had been approved for an additional loan from United Bank approximately four months after the fire.

Relative to Plaintiff's inventory loss, Mr. Shyrock testified that he relied on Plaintiff's 2010 tax return, her sales and use tax filings, and her purchase orders to estimate the value of her lost inventory. His investigation revealed an estimated value of $81,932. He testified that Plaintiff submitted documentation to support an estimated value in excess of $750,000. He claimed that the documentation provided by Plaintiff was duplicative. In estimating the value provided in his report, he added her purchase orders to the value of her existing inventory and then subtracted the sales for the year as reflected in her sales and use tax filings. He acknowledged that he did not conduct interviews to determine the amount of inventory actually housed in the store and that his investigation was reliant upon information provided by Defendant.

Numerous witnesses testified concerning the suspicious nature of the fire and the use of propane tanks to propel the fire.[7] Kenneth and Michael Worley, both volunteer firefighters for the East Polk Fire and Rescue Squad, and James Cearley, chief of the

---

[7] Defendant presented several witnesses to establish the chain of custody of the propane tanks. We will not recount this testimony because it is not pertinent to the issues on appeal.

same squad, testified that they arrived at the scene in the early morning hours of April 24, 2011. Upon their arrival, they discovered that the front entrance was blocked by a black truck. The truck was moved to a safe area, but they still could not gain access to the building. The heat of the fire prevented them from going inside through the only available entrance. Amy Freeman, also a volunteer firefighter, recalled that the doors on both ends of the building were locked and confirmed that there was no viable entrance into the building to fight the fire. She requested permission from the fire chief to move propane cylinders from a rack in an effort to prevent an explosion. She recalled that the cage housing the cylinders was not locked and that she later discovered that the cylinders removed from the cage were empty.

Daniel Foster, an employee of the State of Tennessee who conducted criminal investigations into the illegal use of explosives and arson fires, testified that propane tanks had been set throughout the store to increase the heat of the fire.

James Enos, a regional fire manager for Donan Engineering Company, Incorporated, was accepted by the trial court as an expert witness in his field. He was hired to continue the investigation of the cause and origin of the fire in February 2012. He worked with Glenn Aslinger, now deceased, in his investigation and ultimately generated an initial report on October 18, 2012, and later filed an addendum to the report. The initial report contained the results from his investigation of the cause and origin of the fire, while the addendum addressed the extensive examination of the propane tanks found in the building.

Mr. Enos testified that his investigation revealed that the fire was intentionally set and that "the building had been secured in a fashion to keep people out." He found that propane tanks had been strategically set throughout the building to "carry the fire from one side of the building to the other and front to back." He stated that the inside of the building reached a temperature in excess of 1,800 degrees, causing the metal structure of the building to twist and melt. He identified eight propane tanks found in the building. He could not identify the precise ignition device used but provided that the person responsible allowed gas to escape from one of the propane tanks; lit an ignition device, presumably a candle; and then left the building. He testified that not all of the tanks were open when the fire began but that the heat from the fire caused the pressure release valves to release gas from the tanks, propelling the fire.

Bryan Durig, a forensic engineer employed by Summit Engineering, was accepted by the trial court as an expert witness in the field of mechanical engineering. He was hired to examine the tanks, eight propane tanks and one helium tank, found in the building. He discovered that the propane tanks were empty. His investigation revealed that the valves on at least two of the eight propane tanks were open at the time of the fire.

He explained that the LP gas in the tank would not automatically escape unless an additional device had been inserted into the valve to release the gas. His investigation revealed the presence of debris in one valve that was consistent with a plug generally used to release gas from a propane tank. He stated that the pressure release valve on the closed propane tanks would automatically release gas once the temperature inside the building reached a temperature of 200 degrees.

Plaintiff's Daughter, Sherry Holden Sosebee, testified that she worked at J&B for approximately 15 years. She recalled that she was present for a conversation in which Plaintiff claimed that she would set fire to J&B before she lost her business to the bank.[8] She claimed that Plaintiff also identified someone she would likely hire to complete the task. She repeated Plaintiff's statements to Nancy Kay, who was employed by Thomas Insurance Agency, on July 1, 2011. She also advised Ms. Kay that someone told her that Plaintiff removed fireworks from the store two weeks before the fire. She admitted that she did not disclose her identity to Ms. Kay at that time and that she later used a fictitious email account to contact Ms. Kay again on July 2, 2012. She agreed that she and Plaintiff had not maintained a healthy relationship since her employment was terminated in 2009. She was also involved in the dispute between Mr. Holden and Plaintiff concerning the ownership of a truck.

Ms. Kay identified a memorandum in which she memorialized the July 2011 conversation with Ms. Sosebee as follows:

> 2:30PM lady called from "private" phone number. Wanted to know where they are with the investigation on the fire loss. Told her it is still [under] investigation. She said she didn't want to get involved or give her name but wanted to tell me: She knows of 3 people [Plaintiff] talked to before the claim [and that Plaintiff] told them that she didn't intend to lose the business and would burn it down first. (1) her brother Don Mull in Tampa, Fl. (2) she will have to call me back to verify names. Also- she knows [Plaintiff] took out fireworks from store a couple of weeks before fire [and] now [Plaintiff] is selling them. Lady will call me back with other [two] names and more info.

Ms. Kay also identified an email, dated June 28, 2012, that she received from Ms. Sosebee's fictitious email account. The email provided as follows:

---

[8]Plaintiff and Mr. Quintrell testified as rebuttal witnesses. Plaintiff denied ever expressing a desire to set fire to J&B and asserted that her mortgage payments were current at the time of the fire. Mr. Quintrell confirmed that Plaintiff's mortgage payments were current. He agreed that he was only privy to information concerning her mortgage with People's Bank but claimed that the bank examined her yearly tax returns.

Just wondering if [Plaintiff] has settled all her business on J&B Discount? [Mr. Lance] has been out talking about how he has gotten away with yet another insurance [payoff] which will be his fourth big one (there [have] been several little ones as how he puts it). It is hard to see them do this when so many of us pay insurance each month and yet are lucky enough to never have to make a claim but, still when times are hard we don't make false claims to get us out of trouble. People are talking now that so much time has gone by they think they are in the clear. Just would like to know if you could use some of the names and real facts[.]

Ms. Kay testified that she advised Defendant of the conversation she had with Ms. Sosebee in July 2011. She could not recall whether she forwarded the July 2012 email to Defendant but asserted that she would have advised Defendant of the communication. She agreed that she did not advise Plaintiff of her communications with Ms. Sosebee.

Ms. Carder, Mr. Holden's former wife, confirmed that she had been employed by Plaintiff. She recalled Plaintiff's frustration with J&B and the downturn in the economy. She admitted that Plaintiff had stated that she wished J&B would burn to the ground but denied ever hearing Plaintiff express a desire to set fire to J&B. She also denied ever providing Mr. Holden access to her keys to J&B. She stated that she kept her keys in her vehicle and had returned her keys when her employment with Plaintiff ended. She believed the locks had been changed based upon Plaintiff's practice of changing the locks after others had been terminated from employment.

Ms. Carder testified concerning her relationship with Mr. Holden. She provided that they had not maintained a healthy relationship since their most recent divorce and that they were involved in a custody dispute in May 2011. Despite their tumultuous relationship, she did not believe that Mr. Holden was responsible for the fire at J&B. She agreed that Mr. Holden's business was destroyed by fire in 2002 but asserted that Mr. Holden was "panicked" when he learned of the fire that destroyed his business.

Mr. Holden acknowledged that his business was destroyed by fire but denied any involvement in the fire that destroyed J&B. He acknowledged his disagreement with Plaintiff but denied threatening to set fire to J&B. He claimed that he was with his girlfriend, Amy Harrison, at her mother's house in Georgia at the time in question. His girlfriend confirmed his assertion. Her mother, Shirley Harrison, testified that Amy Harrison and Mr. Holden were generally present for holiday events but could not specifically recall whether Mr. Holden was at her house at the time in question.

Ms. Gribble claimed that Plaintiff called her in the morning to inform her of the fire. She described Plaintiff as "very upset." She recalled visiting Plaintiff at the scene of the fire and noticing a laptop and file folders in the backseat of Plaintiff's car. She asserted that Plaintiff recently advised her to "make herself scarce" when she informed Plaintiff that she had been approached by an investigator.

Following the presentation of the above evidence, Defendant moved for a directed verdict, claiming that the evidence did not support an award of punitive damages, the statutory bad faith penalty, or damages pursuant to the TCPA. The court denied the motion and submitted the case to the jury.

The jury returned a verdict in favor of Plaintiff and awarded her $800,000 in compensatory damages and $128,527.34 in prejudgment interest and found that the evidence supported an award of punitive damages. The jury also assessed a bad faith penalty in the amount of $12,500 and awarded an additional $12,500 in damages pursuant to the TCPA. The case proceeded to a separate trial on the issue of punitive damages. Ms. Janack testified concerning Defendant's net worth and financial condition and its awareness of the harm caused by its failure to act on the claim. Following the presentation of evidence, the jury awarded Plaintiff $267,500 in punitive damages, which Plaintiff elected to receive in lieu of the TCPA damages. This timely appeal followed the court's denial of the motion for new trial and its ruling on other post-trial motions.


## II.    ISSUES

While neither party challenges the jury's verdict, the parties assert that numerous errors committed by the trial court necessitate review on appeal. We consolidate and restate the issues raised on appeal as follows:

A.    Whether the court abused its discretion in ruling on the admissibility of evidence.

B.    Whether the court erred in denying Defendant's motion for a directed verdict.

C.    Whether the court committed plain error by providing a "no other reasonable hypothesis" circumstantial evidence jury instruction.

## III.   DISCUSSION

### A.

Rulings on admissibility of evidence are within a trial court's discretion. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause [s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). We review the decision of the trial court to determine:

> (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principle, and (3) whether the trial court's decision is within the range of acceptable alternatives.

*White*, 21 S.W.3d at 223. Improper admission or exclusion of evidence requires a new trial if the outcome of the trial was affected. Tenn. R. App. P. 36(b); *White*, 21 S.W.3d at 222. If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White*, 21 S.W.3d at 223.

Plaintiff argues that the court erred in excluding an email from Ms. Holtshouser to another of Defendant's agents. The email, dated May 9, 2011, provided as follows:

> I have enclosed a copy of the recorded statement summary. I took the recorded statement from [Plaintiff]. I am in the process of having the statement transcribed and once it is done, I will send a copy to you. I have also enclosed the report from the independent adjuster who is handling the loss. He has provided photographs although he has not completed an estimate. It does appear that there is very little left of this building.
>
> Every indication points to the fact that this was an intentionally set fire. The [fire marshal] in Polk County is investigating.
>
> *I would like to point out that Polk County, Tennessee has a reputation of being one of the most corrupt counties in the south. I have handled other arson fires in that area as well as other fraudulent claims.*

(Emphasis added). Plaintiff offered the evidence for the court's consideration on two occasions, once prior to trial and again during Ms. Holtshouser's testimony after she

- 14 -

claimed to evaluate each case individually without forming a conclusion solely based upon the location of the loss. The trial court excluded the italicized portion of the email, finding that it was not relevant or of probative value. Plaintiff argues that the evidence was relevant as to whether Defendant's failure to act was "malicious" or "intentional" and further claims that the statement was relevant to impeach Ms. Holtshouser's claim of impartiality. Plaintiff asserts that the jury's consideration of the email could have resulted in a higher punitive damage award. Defendant responds that the court did not abuse its discretion in excluding the evidence.[9]

Relevant evidence is defined by Rule 401 of the Tennessee Rules of Evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "In other words, evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., *Tennessee Law of Evidence* § 4.01[4], at 4-9 (5th ed. 2005). "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. If the evidence is relevant, it is admissible unless another legal rule excludes it. Tenn. R. Evid. 402.

Under Rule 403 of the Tennessee Rules of Evidence, the trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This rule requires trial courts to conduct a two-part balancing test. *White*, 21 S.W.3d at 227. First, the trial court must "balance the probative value of the [challenged evidence] against the countervailing factors." *Id.* "After the court has engaged in the balancing analysis, it may then exercise its discretion to determine whether the evidence should be excluded if the prejudice substantially outweighs the probative value of the evidence." *Id.* (citation omitted).

The trial court is best situated to conduct the Rule 403 balancing test. Assuming, without deciding, that the evidence was relevant, any bias Ms. Holtshouser may have held toward Polk County in general was of minimal probative value when the record reflects that Ms. Holtshouser did not possess the requisite authority to approve or deny the claim. Additionally, the claim was investigated by an independent claims adjuster and other independent experts. In deference to the trial court's discretion in such matters, we affirm the court's ruling.

---

[9] Defendant also claims that the record is insufficient for this court's review. We disagree with Defendant's assertion and will address the issue.

B.

The Tennessee Rules of Civil Procedure provide for directed verdicts as follows:

A motion for a directed verdict may be made at the close of the evidence offered by an opposing party or at the close of the case. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

Tenn. R. Civ. P. 50.01.

In considering a motion for a directed verdict, the trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 390 (Tenn. 2006) (quoting *Crain v. Benton*, 823 S.W.2d 187, 195 (Tenn. Ct. App. 1991)); *Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006). A motion for a directed verdict should not be granted "if the party with the burden of proof has presented sufficient evidence to create an issue of fact for the jury to decide." *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002) (citing *White*, 21 S.W.3d at 231). A party has created a jury issue when there is doubt about the conclusions drawn from the evidence. *Id.* The grant or denial of a motion for directed verdict is a question of law; therefore, the court's decision is subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

Defendant asserts that the trial court erred in allowing the jury to consider the TCPA claim following the General Assembly's enactment of Tennessee Code Annotated section 56-8-113, which specifically prohibits private causes of action in cases involving insurance claims. Defendant alternatively argues that Plaintiff failed to present sufficient evidence to create an issue of fact for the jury. Plaintiff responds that her cause of action accrued before the enactment date of section 56-8-113.

Section 56-8-113, which was enacted on April 29, 2011, by Chapter 130 of the Public Acts of 2011 at section 1, provides,

> Notwithstanding any other law, title 50 and this title shall provide the sole and exclusive statutory remedies and sanctions applicable to an insurer, person, or entity licensed, permitted, or authorized to do business under this title for alleged breach of, or for alleged unfair or deceptive acts or practices in connection with, a contract of insurance as such term is defined in § 56-7-101(a). Nothing in this section shall be construed to eliminate or otherwise affect any:
>
> (1) Remedy, cause of action, right to relief or sanction available under common law;
>
> (2) Right to declaratory, injunctive or equitable relief, whether provided under title 29 or the Tennessee Rules of Civil Procedure; or
>
> (3) Statutory remedy, cause of action, right to relief or sanction referenced in title 50 or this title.

(Emphasis added.). Section 2 of that Public Act provides,

> This act shall take effect upon becoming law, the public welfare requiring it, and shall apply to any cause of action accruing on or after such date.

This court has repeatedly held that a TCPA claim accrues when the unlawful act or practice is discovered, thereby making the discovery rule applicable to such actions. *Fortune v. Unum Life Ins. Co.*, 360 S.W.3d 390, 402 (Tenn. Ct. App. 2010) (quoting *Schmank v. Sonic Auto., Inc.*, No. E2007-01857-COA-R3-CV, 2008 WL 2078076, at *2 (Tenn. Ct. App. May 16, 2008)).

In this case, the evidence reflects that the initial proof of loss form was not submitted until June 22, 2011. Accordingly, Plaintiff was unaware of sufficient facts prior to April 29, 2011, that she had sustained injury or damages as a result of Defendant's actions. *Id.* at 403. Accordingly, we conclude that Plaintiff's claim accrued after April 29, 2011, rendering section 56-8-113 applicable and prohibiting review of the TCPA claim.

This conclusion does not end our inquiry because section 56-8-113 does not prohibit recovery of bad faith or common law punitive damages. Defendant asserts that it possessed substantial legal grounds for delaying action on the claim pending the

completion of the investigation and that Plaintiff failed to present sufficient evidence to create an issue of fact for the jury. Plaintiff responds that she presented sufficient evidence to survive a motion for directed verdict on these issues.

Relative to the bad faith claim, this court has held that before recovery pursuant to Tennessee Code Annotated section 56-7-105 is permitted a plaintiff must prove that

> (1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making his demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith.

*Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986) (citations omitted). Further,

> The bad faith penalty is not recoverable in every refusal of an insurance company to pay a loss. An insurance company is entitled to rely upon available defenses and refuse payment if there is substantial legal grounds that the policy does not afford coverage for the alleged loss. If an insurance company unsuccessfully asserts a defense and the defense was made in good faith, the statute does not permit the imposing of the bad faith penalty.

*Nelms v. Tennessee Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978) (citation omitted). "The question of an insurance company's bad faith is for the jury if from all of the evidence it appears that there is a reasonable basis for disagreement among reasonable minds as to the bad faith of the insurance company in the handling of the claim." *See Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370-71 (Tenn. 2006) (considering a claim for an insurance company's alleged bad faith refusal to settle).

Given the circumstances and conditions surrounding the fire, we believe there were valid reasons for the insurance company to question the loss. The record reflects that Defendant immediately began its investigation of the claim by hiring an independent claims adjuster and other experts to evaluate the cause and origin of the fire and any potential financial motive on the part of Plaintiff. Further, the results of the investigation supported Defendant's honest and good faith belief that Plaintiff was somehow involved in setting the fire. Accordingly, we hold that the evidence was insufficient to support a finding of bad faith regarding Defendant's handling of Plaintiff's claim and that the trial court erred in submitting the issue of bad faith to the jury.

Likewise, the evidence was insufficient to support an award of punitive damages regarding Defendant's handling of Plaintiff's claim. Punitive damages, while generally "not available in a breach of contract case," may be awarded in a breach of contract action under "certain circumstances." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n. 2 (Tenn. 2012) (citations omitted). To recover punitive damages, the trier of fact must find that a defendant acted either intentionally, fraudulently, maliciously, or recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). As previously stated, the results of the investigation supported Defendant's honest and good faith belief that Plaintiff was somehow involved in setting the fire. Accordingly, we conclude that the trial court erred in submitting the issue of punitive damages to the jury.

C.

Defendant argues that the court erred by issuing the following jury instruction:

> Where the proof of arson is entirely circumstantial, a finding for the insurer is warranted only where the evidence is of such import that it will sustain no other reasonable hypothesis but that [Plaintiff] was responsible for the fire.

The parties appear to agree that this portion of the jury charge was erroneous. *See State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011) (rejecting the "no other reasonable hypothesis" instruction as applied to criminal cases). Plaintiff asserts and Defendant concedes that the issue is subject to waiver pursuant to Rule 3(e) of the Tennessee Rules of Civil Procedure[10] because the issue was not raised in the motion for new trial. Defendant requests review of this issue pursuant to the plain error doctrine as delineated in *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994).

The *Adkisson* test is as follows:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

---

[10] [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."

899 S.W.2d at 641-42. While this test is not necessarily applicable in civil actions, Rule 36(b) of the Tennessee Rules of Appellate Procedure has since been amended to incorporate the plain error doctrine. Rule 36(b) provides, in pertinent part, as follows:

> When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.[11]

Thus, *review* of an error is not warranted unless (1) consideration of the error is necessary to do substantial justice and (2) the error affected the substantial rights of Defendant. Moreover, *relief* from any error is not warranted unless "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

The "no other reasonable hypothesis" instruction offered in this case was erroneous. Indeed, "arson may be proved by a simple preponderance of the evidence and may be by circumstantial evidence." *McReynolds v. Cherokee Ins. Co.*, 815 S.W.2d 208, 211 (Tenn. Ct. App. 1991) (citing *Aetna Cas. & Sur. Co. v. Parton*, 609 S.W.2d 518 Tenn. Ct. App. 1980)). This court addressed the application of circumstantial evidence in such cases as follows:

> When a party in a civil case relies upon circumstantial evidence to make out his case, the facts and circumstances shown by the evidence and relied on to sustain his theory must not only be consistent with that theory, but must also be inconsistent with any other reasonable theory. However, they need not be so certain as to exclude all other rational theories. A preponderance of such circumstantial evidence is all that is required in a civil case.

*Aetna*, 609 S.W.2d at 520. Defendant presented an overwhelming amount of evidence in support of its defense of arson in this case. However, the facts and circumstances shown by the evidence and relied on to sustain Defendant's theory were not consistent with only its theory and inconsistent with any other reasonable theory. *See generally Dorantes*, 331 S.W.3d at 381 (providing that the distinction between the appropriate standard and the "reasonable hypothesis" language has "rarely made a difference"). Accordingly, we hold that the inclusion of the erroneous provision was harmless because it did not affect the judgment or prejudice the judicial process.

---

[11]Rule 103(d) of the Tennessee Rules of Evidence also permits review of "plain errors affecting substantial rights although they were not brought to the attention of the court."

## IV.    CONCLUSION

We reverse the judgment as to the court's denial of the motion for a directed verdict and the jury's subsequent imposition of the bad faith penalty and the award of punitive damages and damages pursuant to the Tennessee Consumer Protection Act.  We affirm the judgment in all other respects and remand this case to the trial court for entry of judgment on the jury's verdict consistent with the opinion of this court.  Costs on appeal are taxed one-half to the appellant, Owner's Insurance Company and one-half to the appellee, Judy Lance d/b/a J&B Discount.


_____
JOHN W. McCLARTY, JUDGE