IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 19, 2017 Session

## LEW WINTERS v. SOUTHERN HERITAGE BANK

**Appeal from the Circuit Court for Bradley County**
**No. V-12-601      Jerri Bryant, Chancellor[1]**

_____

### No. E2016-01679-COA-R3-CV

_____

This appeal arises from an alleged breach of contract. Lew Winters ("Winters") sued Southern Heritage Bank ("the Bank") in the Circuit Court for Bradley County ("the Trial Court") for, among other things, breach of contract. Specifically, Winters asserted that the Bank wrongly backed out of a tripartite agreement involving the Internal Revenue Service ("the IRS") which would have allowed Winters to obtain financing for new tractors and therefore be able to continue operating his trucking company. The Bank filed a motion for summary judgment, arguing that no such agreement was reached. Instead, according to the Bank, the parties only engaged in discussions about a possible resolution. The Trial Court granted the Bank's motion for summary judgment. Winters appealed to this Court. We hold, _inter alia_, that the purported oral agreement violates the Statute of Frauds. We affirm the judgment of the Trial Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Michael E. Richardson, Chattanooga, Tennessee, for the appellant, Lew Winters.

H. Rowan Leathers and Valerie Diden Moore, Nashville, Tennessee, for the appellee, Southern Heritage Bank.

_____

[1] By interchange.

# OPINION

## Background

Winters started a trucking company, Ocoee River Transport ("Ocoee"), in the 1990s. The Bank financed a terminal and several tractors and trailers bought by Winters' company. Winters' then-wife, Wanda Winters, came to handle the daily financial operations of the company. Cash flow was an ongoing issue for Ocoee. Mrs. Winters entered into a factoring agreement with the Bank whereby the Bank paid Ocoee for its account receivables and the Bank then would collect the receivables. Ocoee pledged all its account receivables to the Bank, and the Bank set up a suspense account whereby the Bank collected all receivables or funds paid to Ocoee.

Over the course of time, the economy worsened and Ocoee's customers were slow to pay, if they did. In 2006, Mrs. Winters began submitting false invoices to the Bank. In 2007, Winters learned of the problems facing the company and confronted Mrs. Winters. Mrs. Winters acknowledged submitting false invoices. Mrs. Winters' employment with Ocoee ended, and she later pled guilty to a federal charge of bank fraud arising from the matter.

Winters approached the Bank expressing a desire to rectify the situation and address the $700,000 deficiency caused by the faulty account receivables. The factoring agreement was terminated while the suspense account remained in place. As part of a restructuring of debt, Ocoee entered into a promissory note in September 2007 in the amount of $2,089,282. This promissory note was secured by a personal guarantee signed by Winters.

This arrangement continued for some years. In 2011, new problems emerged. The Bank advised Winters that a minimum payment was coming due. In addition, problems with the IRS were on the horizon for Ocoee. Winters believed that his business could perform much better if he could obtain new trucking equipment to ease the maintenance expense of his aging fleet. However, in order to obtain financing for the new equipment, Winters and Ocoee had to contend with encumbrances the IRS would place on the trucks.

On December 6, 2011, a meeting involving representatives of Ocoee, the IRS, and the Bank took place. Attorney Dale Allen attended the meeting on behalf of Winters. What, if any, agreement was reached at this meeting is disputed on appeal. In any event, Winters apparently understood that an agreement had been reached whereby: the Bank would allow Winters to purchase new tractors without asserting a security interest in the tractors; the Bank further would refrain from foreclosing upon Ocoee or Winters if he

continued to allow the Bank to collect payments made to Ocoee as before; and, that an Offer and Compromise would be submitted in order to work out problems with the IRS. The purported agreement, if there was one, did not last long. The next day, December 7, 2011, the Bank indicated that it had not agreed to the terms Winters thought were agreed upon. The IRS thereafter pulled out of talks. The Bank foreclosed upon Ocoee's assets and Winters' personal assets, including his home. Ocoee filed for bankruptcy.

In June 2012, the Bank filed suit in Chancery Court against Winters and his ex-wife to recover on breach of personal guaranty agreements. In August 2012, Winters sued the Bank in the Trial Court, alleging, among other things, breach of contract stemming from the December 6, 2011 meeting. Winters' complaint stated, in part:

8) The Plaintiff would show that he stepped down as the full-time operator and corporate officer in charge of the day to day operations of Ocoee Transport and that his ex-wife took over daily operations. While the Plaintiff's ex-wife was in charge of the day to day operations of Ocoee Transport, the Plaintiff would show that agents of the Defendant bank made coercive demands upon her and demanded that she begin to factor the accounts receivables of the Ocoee Transport with the bank, a business relationship that was not in the best interest of the corporation. Among other things, the bank charged excessive fees.

9) The Plaintiff avers and charges that actions taken by the bank caused a adverse effect upon Plaintiff's business and the Defendant bank eventually undertook to control the day to day financial operations of Ocoee Transport.

10) The Plaintiff undertook to re-take control of his corporation's activities, but met resistance from the Defendant bank. The Defendant bank set up a suspense account to control the financial operations of the corporation and to control all monies coming into and out of the corporation.

11) The Plaintiff would show that he had personal tax obligations and had guaranteed corporate debt obligations and the Plaintiff's personal exposure was substantially increased by wrongful actions taken by the Defendant bank.

12) The Plaintiff would also show that the bank manipulated the corporation's financial operations so as to keep legitimate tax obligations of the Plaintiff and the Plaintiff's corporation, including obligations owed to the Internal Revenue Service, from properly being paid, to the financial benefit of the Defendant bank.

13) The Plaintiff was forced to go to the Defendant bank every business day and obtain the Defendant's approval as to payment of all

business expenses, including payroll. The Plaintiff avers and charges that by taking over the control of the Plaintiff's corporation's business operations, the Defendant bank undertook and owed him a duty, in his capacity as a shareholder, to properly manage the business and not take actions that would financially damage his stock ownership interest in Ocoee Transport.

14) Plaintiff would show that the Defendant breached these duties and have caused him substantial financial damage.

15) The Plaintiff would show that the bank's actions in controlling the financial operations of Ocoee Transport also resulted in the Plaintiff's inability to purchase new equipment for his tractor-trailer fleet, which, new equipment was needed in order to continue to operate the corporation as a viable going concern. The Plaintiff obtained approval for equipment loans, but, was unable to secure the loans that were needed to continue the successful operation of his company due to the wrongful actions taken by the Defendant bank.

16) The Plaintiff would show that as a proximate result of the wrongful actions taken by the Defendant bank, he was eventually forced to place his corporation into a bankruptcy. His stock ownership in the corporation has lost all value.

17) The Plaintiff would show that he was in the midst of negotiations with the Internal Revenue Service and representatives of the Defendant bank to work out a three way agreement which would be financially beneficial to the Plaintiff, individually, and in his capacity as a shareholder and corporate officer.

18) The Plaintiff would show that a meeting was conducted at the Defendant bank on December 06th, 2011, with representatives for the Plaintiff, the Internal Revenue Service, and agents of the bank.

19) The Plaintiff avers and charges that an Agreement was reached as an outcome of the December 06th meeting, whereby the Internal Revenue Service entered into an offer and compromise with the Plaintiff's representatives and the Defendant bank, which would be of tremendous financial benefit to the Plaintiff, individually, and to his corporation.

20) The Plaintiff would show that after that meeting, the Defendant bank wrongfully breached the Agreement it had entered into with the Plaintiff and the Internal Revenue Service, as a proximate result of which the Plaintiff has suffered substantial monetary damages.

21) The Plaintiff would show that representatives of the Defendant bank made misrepresentations to both him and to agents of the Internal Revenue Service, which misrepresentations were relied upon, both by the Plaintiff and the Internal Revenue Service.

-4-

22) The Plaintiff would show that he confronted a representative of the Defendant bank, after the bank repudiated the Agreement it had entered into with the Plaintiff and the Internal Revenue Service, at which time the Plaintiff was told by a Defendant's representative that the bank had decided to throw a monkey wrench into the Agreement. The Plaintiff avers and charges that the Defendant's breach of contract and tortious misconduct was done with the express intent of trying to coerce or extort additional monies out of the Plaintiff, after the bank had reached an Agreement with the Plaintiff and the Internal Revenue Service.

23) The Plaintiff avers and charges that the Defendant has acted with extreme bad faith and has violated contractual duties owed to the Plaintiff.

24) The Plaintiff avers and charges that another representative of the bank has made comments to the effect that it had repudiated the Agreement entered into with the Plaintiff and the Internal Revenue Service and that the bank's representative intended to bury the Plaintiff.

25) The Plaintiff avers and charges that such conduct constitutes outrageous conduct by the Defendant bank and its' agents, as a proximate result of which the Plaintiff has suffered substantial damages.

26) The Plaintiff avers and charges that because of the bank's actions, he has suffered substantial personal loss.

27) The Plaintiff would also show that the bank, after breaching his contractual obligations and others dues [*sic*] owed to the Plaintiff, later wrongfully foreclosed upon the Plaintiff's personal residence, which the bank had a deed of trust upon.

The Chancery and Circuit Court cases were consolidated. The Bank filed a motion for summary judgment, to which Winters filed a response. Winters cited, among other things, the affidavit of attorney Dale Allen in support of his position that an agreement with the Bank had been reached and later breached by the Bank. The Allen affidavit stated, in part:

4. During the latter part of 2011, my former partner, J. Eric Butler, and I performed legal services for Lew Winters. We were negotiating on behalf of Mr. Winters with IRS in an effort to arrange a payment plan acceptable to IRS so the Service (particularly the Collection Division) would not object to or interfere with Mr. Winters' business plan to obtain financing for acquisition of new trucking equipment. In our negotiations with IRS, we were trying to assist the Service's Revenue Officer in understanding that Mr. Winters' acquisition of such new equipment would enhance his and his company's ability to satisfy tax debt to IRS.

5. As legal counsel for Mr. Winters, we understood Mr. Winters and Ocoee River Transport needed to reduce the maintenance expense they were incurring on their aging fleet of tractors and related equipment, and we further understood that Winters had obtained a commitment from Paccar, a manufacturing company headquartered in Bellevue, WA, which would enable Winters to purchase a number of new items the purchase of which would cut his operating expenses considerably and improve his business model. At the same time, Mr. Winters and Ocoee River Transport had outstanding loans with Southern Heritage Bank for which Southern Heritage Bank held security interests in many of the personal assets of Mr. Winters and the corporate assets of Ocoee River Transport. As Mr. Winters' counsel, we understood that to achieve his goals, we had to reconcile both IRS and Southern Heritage Bank in order to prevail upon both of them to allow Mr. Winters' business plans to proceed successfully.

***

8. After considerable discussion, the parties, including Lew Winters, IRS, and representatives of Southern Heritage Bank, appeared to reach an agreement at our December 6, 2011 meeting. As I understood the parties' language, IRS agreed to allow Mr. Winters to submit an Offer in Compromise allowing IRS to receive installment payments and thereby deferring imposition of any federal tax liens on equipment to be purchased by Winters from Paccar. Further, Southern Heritage Bank agreed to allow Mr. Winters and his company, Ocoee River Transport, to continue with the same payment schedule they had adhered to in the past using a pre-established drop box system. This three (3)-way agreement seemed mutually beneficial to all three (3) parties and was supported by consideration in that both IRS and Southern Heritage Bank were making inroads on retiring Ocoee River Transport's debt to each entity. The consideration to Southern Heritage Bank was that Winters and Ocoee River Transport would continue to pay down their debt. Assuming Mr. Winters' purchase of new equipment, and the related reduction in the monthly expenses attributable to Ocoee River Transport, it seemed Mr. Winters would be able to accelerate the payoff of the debt otherwise due the bank.

9. When we departed our meeting of December 6, 2011 at Charlie Burns' office, we clearly had a handshake agreement among the attorneys, the bankers, and the IRS representatives, and my recollection is that Mr. Butler and I were to continue to work with IRS to complete the compromise paperwork.

10. My partner, Eric Butler, and I advised Mr. Winters that we had reached an agreement at the December 6, 2011 meeting enabling him to go forward with the purchase of new trucking equipment

11. Surprisingly, Mr. Winters advised us a couple of days later that Lee Stewart, president of Southern Heritage Bank, had told him that the bank had decided not to proceed with the above-referenced December 6, 2011 agreement. Sometime later, Southern Heritage Bank appeared to change its position yet again expressing a desire to go back to the December 6, 2011 agreement, but by that time, IRS was concerned with the bank's conduct and refused to come back to negotiations or to complete an agreement.

12. Charlie Burns, attorney for Southern Heritage Bank, notified me that, notwithstanding appearances of an agreement on December 6 that the bank had decided to commence foreclosure procedures against Mr. Winters. Attached to my Affidavit as an exhibit is an email dated January 10, 2012 from Charlie Burns to me, indicating that the bank was foreclosing upon Mr. Winters. It is my understanding that the bank's actions in initiating foreclosure proceedings prompted Ocoee River Transport to cease operations, and further, forced Mr. Winters to file a corporate bankruptcy for Ocoee River Transport.

The Bank filed a supplemental memorandum of law in which it raised the Statute of Frauds as an issue, as well, based upon the lack of any writing to come out of the December 6, 2011 meeting. In July 2016, the Trial Court entered an order granting the Bank's motion for summary judgment relative to Winters' Circuit Court claims. In its order, the Trial Court stated in relevant part:

The Court, as a result of the pleadings filed in this action and the Affidavit of Dale Allen, understands that Plaintiff asserts a breach of contract claim against the Bank based on a contract allegedly arising as a result of discussions at a meeting occurring on December 6, 2011. This meeting involved representatives of the Bank, representatives of Plaintiff, and representatives of the Internal Revenue Service ("IRS"). The Court understands based on the argument of Plaintiff's legal counsel that the Bank allegedly agreed at this meeting to forbear foreclosure of its rights against Plaintiff pursuant to two Guaranty agreements executed by Plaintiff in favor of the Bank, to allow Plaintiff to continue with the same payment schedule that had been adhered to in the past using a pre-established drop box system, and to allow Plaintiff to purchase new tractors for his aging fleet. The Court noted that it is undisputed that the parties did not reduce their discussions at the December 6, 2011 meeting to writing. The Court

-7-

further noted that T.C.A. § 29-2-101 provides that "no action shall be brought against a lender or creditor upon … any promise or commitment to lend money or to extend credit, or upon any promise or commitment to alter, amend, renew, extend, or otherwise modify or supplement any written promise *… shall be in writing and signed by the lender or creditor, or some other person lawfully authorized by such lender or creditor*." Additionally the express language of the two Guaranty agreements require that any modification to the Guaranty agreements must be in writing to be enforceable. Therefore Plaintiff has failed to produce admissible evidence to properly support his claim for breach of contract and accordingly the same should be dismissed.

Additionally, Plaintiff asserts a claim for bad faith, or breach of the duty of good faith and fair dealing. Such a claim is limited to the terms of an enforceable contract. Without an enforceable contract, there can be no duty of good faith and fair dealing. *See Berry v. Mortgage Elec. Registration Systems*, 2013 WL 5634472, *7 (Term. Ct. App. Oct. 15, 2013) (noting that "absent a valid claim for breach of contract, there is no cause of action for breach of implied covenant of good faith and fair dealing"). Because the Court has determined that no enforceable contract exists, Plaintiff cannot assert a valid claim for breach of the implied duty of good faith and fair dealing and accordingly such claim should be dismissed.

Accordingly,

It is hereby ordered, adjudged and decreed that all of the claims set forth in Plaintiff's Complaint are hereby dismissed with prejudice . . . .[2]

The Trial Court also entered an order granting summary judgment to the Bank relative to its claims against Winters in Chancery Court. Winters timely appealed to this Court.

### Discussion

Although not stated exactly as such, Winters raises the following issues on appeal: 1) whether the Trial Court erred in dismissing Winters' claim based on the Statute of Frauds, codified at Tenn. Code Ann. § 29-2-101, and, 2) whether the Trial Court erred in dismissing Winters' complaint without considering Winters' misrepresentation claim against the Bank.

As our Supreme Court has instructed regarding appellate review of a trial court's ruling on a motion for summary judgment:

---

[2] Winters' claim for outrageous conduct previously had been dismissed.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (*citing Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

\* \* \*

[I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id*. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of

-9-

the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye v. Women's Care Cntr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

We first address whether the Trial Court erred in dismissing Winters' claim based on the Statute of Frauds, codified at Tenn. Code Ann. § 29-2-101. The statute provides as relevant:

No action shall be brought against a lender or creditor upon any promise or commitment to lend money or to extend credit, or upon any promise or commitment to alter, amend, renew, extend or otherwise modify or supplement any written promise, agreement or commitment to lend money or extend credit, unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the lender or creditor, or some other person lawfully authorized by such lender or creditor.

Tenn. Code Ann. § 29-2-101 (b)(1) (2012).

In a similar scenario, this Court discussed whether the Statute of Frauds was implicated by an alleged promise to postpone foreclosure as follows:

A promise to complete the loan modification review process and, more importantly, postpone the foreclosure proceedings would constitute modifying the "clear and unambiguous" literal terms of the Deed which provide Citi with clear rights to accelerate the debt and proceed to foreclosure if the Jacksons defaulted. *Dick Broadcasting Co.*, 395 S.W.3d at 659. Citi exercised those rights, and the Jacksons sought to modify those contractual rights by postponing the foreclosure while the review process was ongoing. Therefore, we hold that the alleged promise to complete the

-10-

loan modification review and postpone the foreclosure does in fact constitute modifying the Note and Deed, which is a modification of an agreement to extend or lend credit. Thus, the alleged promise falls under the respective umbrellas of the Statute of Frauds and the terms of the Note requiring a signed writing by both parties. A signed writing by both parties was required to enforce the promise alleged by the Jacksons.

Citi has successfully shown that the record is devoid of any written, memorialized agreement between the parties that Citi would process the Jacksons' loan modification and postpone the foreclosure . . . .

*Jackson v. CitiMortgage, Inc.*, No. W2016-00701-COA-R3-CV, 2017 WL 2365007, at *7 (Tenn. Ct. App. May 31, 2017), *no appl. perm. appeal filed*.

It is undisputed that no writing memorialized any purported agreement at the December 6, 2011 meeting. Winters in his brief "concedes that any action brought upon any promise or commitment by a banker to alter, amend, remove, extend or otherwise modify or supplement any written promise must be in writing and signed by the lender." However, Winters argues that the agreement did not in any way modify or alter the guaranty agreement signed by him, and therefore the Statute of Frauds is inapplicable. Winters instead argues that the agreement, rather than constituting a promise by the Bank to refrain from exercising its right to foreclosure, entailed that the Bank would continue to collect his receivables as before.

We find this unpersuasive. Whether the Bank promised not to foreclose, or to keep up the old arrangement while implicitly agreeing not to foreclose, is a meritless distinction. If the Bank never renounced its right to foreclose, then Winters had no basis for complaint when the Bank exercised its right. If the Bank renounced its right to foreclose, that would constitute a modification of the guaranty and thus implicate the Statute of Frauds.

In addition to the Statute of Frauds, there are multiple other issues with Winters' position that an agreement emerged from the December 6, 2011 meeting. It never has been conclusively established who the three parties to this alleged three-way agreement were. Did it include Winters or did it include Ocoee as the third party along with the Bank and the IRS? The precise terms of the agreement never have been identified. Finally, it is unclear that there was any consideration for the purported agreement.

Winters states that the Statute of Frauds never was properly pled by the Bank in a responsive pleading. The Bank points out that it raised the Statute of Frauds as an issue in a supplemental memorandum of law in support of its motion for summary judgment,

which our review of the record confirms. We, therefore, hold that Winters had sufficient opportunity to respond to the Statute of Frauds defense raised by the Bank at the summary judgment stage. However, even if the Trial Court erred in basing its ruling on the Statute of Frauds, which we have held not to be so, we nevertheless would affirm its decision regarding the December 6, 2011 meeting for the other reasons discussed above. As our Supreme Court long ago stated: "[I]f the Trial Judge reached the right result for the wrong reason, there is no reversible error." *Shutt v. Blount*, 194 Tenn. 1, 249 S.W.2d 904, 907 (Tenn. 1952).

The next and final issue we address is whether the Trial Court erred in dismissing Winters' complaint without considering Winters' misrepresentation claim against the Bank. To recap, Winters' misrepresentation claim was articulated as follows: "The Plaintiff would show that representatives of the Defendant bank made misrepresentations to both him and to agents of the Internal Revenue Service, which misrepresentations were relied upon, both by the Plaintiff and the Internal Revenue Service."

Our Supreme Court has instructed as to the elements which must be proven in order to prevail on a claim for intentional misrepresentation stating:

Our current common-law claim for intentional misrepresentation is the successor to the common-law action for deceit. *First Nat'l Bank of Louisville v. Brooks Farms*, 821 S.W.2d 925, 927 (Tenn. 1991). In fact, "intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are different names for the same cause of action. *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 n.1 (Tenn. 1999). In this opinion, we will refer to the cause of action as a claim for intentional misrepresentation, and, in order to avoid confusion, we suggest that this term should be used exclusively henceforth. *See Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012) (noting that "intentional infliction of emotional distress" and "outrageous conduct" were different names for the same tort and stating that the tort should be referred to as "intentional infliction of emotional distress").

To recover for intentional misrepresentation, a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the

representation; and (6) that the plaintiff sustained damages as a result of the representation. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d at 311 (quoting *Metropolitan Gov't of Nashville & Davidson Cnty. v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992)); *see also* 8 Tennessee Practice: Tennessee Pattern Jury Instructions—Civil § 8.36, at 357 (11th ed. 2011).

*Hodge v. Craig*, 382 S.W.3d 325, 342-43 (Tenn. 2012) (footnotes omitted).

Winters asserts that the Trial Court failed even to consider his misrepresentation claim in its final judgment. Indeed, the Trial Court did not mention it. However, Winters neither stated in his complaint with any degree of particularity how the elements of misrepresentation were met, nor had he produced any evidence in support of those elements by the summary judgment stage. In particular, although Winters alleged, in a conclusory manner, that the alleged misrepresentations by the Bank were relied upon by both he and the IRS, Winters never stated the nature of this reliance. Taking Winters' version of events at face value, on December 6, 2011 the Bank duped him, or rather his attorney who represented him at the meeting, into believing that he had an agreement whereby he could obtain new equipment and keep the old arrangement with the Bank going. According to Winters, the Bank decided to "throw a monkey wrench" into the plan the very next day. Winters has failed to articulate in what manner he relied on the truth of the Bank's representation during that very brief period in which he thought he had an agreement. Winters states that he felt an assurance that the matter was resolved as a result of the meeting, but in our judgment a mere fleeting feeling of assurance cannot establish reliance for purposes of intentional misrepresentation.

There being no genuine issues of material fact in this case, and with the Bank having made a properly supported motion for summary judgment, we find no error in the Trial Court's granting summary judgment to the Bank. We, therefore, affirm the judgment of the Trial Court.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Lew Winters, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE